1                UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    NORTHERN CALIFORNIA POWER        )

5    AGENCY, et al.,                  )

6            Plaintiffs,              ) Case No.

7                 vs.                 ) 14-817C

8    THE UNITED STATES OF AMERICA, )

9            Defendant.               )

10

11

12                           Courtroom 7

13            Howard T. Markey National Courts Building

14                   717 Madison Place, N.W.

15                      Washington, D.C.

16                  Wednesday, June 17, 2015

17                       10:00 a.m.

18                 Telephonic Status Conference

19

20

21            BEFORE:   THE HONORABLE THOMAS C. WHEELER

22

23

24

25    Sara J. Vance, CERT, Digital Reporter and Transcriber

Northern California Power Agency, et al. v. USA

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:

 3             DAVID T. RALSTON, JR., ESQ.

 4             JAY N. VARON, ESQ.

 5             JENNIFER M. FORDE, ESQ.

 6             FRANK S. MURRAY, ESQ.

 7             ANNA S. ROSS, ESQ.

 8             Foley & Lardner, LLP

 9             3000 K Street, NW

10             Suite 600

11             Washington, DC  20007-5109

12             (202) 295-4097

13             (202) 672-5399 (fax)

14             dralston@foley.com

15    ON BEHALF OF THE DEFENDANT:

16             PAUL DAVIS OLIVER

17             U.S. Department of Justice

18             Civil Division

19             1100 L Street, N.W., Room 12106

20             Washington, DC  20530

21             (202) 353-0516

22             (202) 514-8624 (fax)

23             p.davis.oliver@usdoj.gov

24    ALSO PRESENT:

25             Carter Brown, Department of Interior
```

Northern California Power Agency, et al. v. USA                    6/17/2015

```
 1                    P R O C E E D I N G S
 2                 -    -    -    -    -
 3           (Proceedings called to order, 10:00 a.m.)
 4           THE COURT:  Good morning.
 5           ALL COUNSEL:  Good morning.
 6           THE COURT:  Please be seated.
 7           We're on the record this morning in the case of
 8   Northern California Power Agency, et al., vs. The United
 9   States, Docket Number 14-817C.  And let us begin with the
10   introductions of counsel, first for the Plaintiff.
11           MR. RALSTON:  Good morning, Your Honor, David
12   Ralston, appearing counsel of record for the Plaintiff,
13   Northern California Power Agency, and others.  And with me
14   are my colleagues from Foley & Lardner, Jay Varon, Jennifer
15   Forde, Anna Ross, and Frank Murray.
16           THE COURT:  Welcome.  Nice to have all of you.
17           MR. RALSTON:  Thank you, Judge.
18           MR. MURRAY:  Thank you, Your Honor.
19           THE COURT:  And for the United States?
20           MR. OLIVER:  Yes, hi.  Davis Oliver, the Department
21   of Justice, representing the Department of Interior in this
22   matter.  I have agency counsel from the Department of
23   Interior, Mr. Carter Brown, here.
24           MR. BROWN:  Hello.
25           THE COURT:  All right.  Welcome to you gentlemen.
```

Northern California Power Agency, et al. v. USA                    6/17/2015

1            As you know, I recently received this case by

2     transfer from Judge Block, and I saw right away that there

3     was a fully briefed motion, so I thought we'd get right to

4     it.  And that's why we're here today to hear your oral

5     arguments on the motion to dismiss.

6            So, it's your motion, Mr. Oliver, would you like to

7     begin?

8            MR. OLIVER:  Yes, Your Honor.

9            May it please the Court.  Plaintiffs' illegal

10    exaction claim is unlike any other illegal exaction claim for

11    which this Court has found that it has jurisdiction over

12    because there is a fundamental disconnect between its claim,

13    its illegal exaction claim, and the statute upon which it's

14    based.  And that disconnect is that the claim is premised

15    upon the Section 3407 of the Central Valley Project

16    Improvement Act.

17           It's based upon there being a right to a

18    proportional assessment; that is, that water users and power

19    users must be assessed in equal -- in proportion to their

20    repayment allocation costs.  What that means is there's a

21    certain amount of cost that they have to repay for

22    contributing to the Central Valley Project, based upon the

23    benefits that power gets and the water users get, and that

24    the -- this restoration fund, which is the fund at issue,

25    Reclamation assesses both of these -- the water and the power

Northern California Power Agency, et al. v. USA                    6/17/2015

1    users.

2              The relevant language is that the water and power

3    users must -- shall be assessed to the greatest extent

4    practical in the same proportion as their repayment

5    allocation.  So, that -- so, there is a disconnect between a

6    claim based upon a right to a proportional assessment and the

7    language, which says that Interior shall, to the greatest

8    extent practical, achieve that, because what that language

9    does is that it -- if you didn't have that language in which

10   it was actually an earlier version of that bill, as I point

11   out in the brief, actually did have that language and was

12   just a flat out you have a right to proportional assessment.

13             With that --

14             THE COURT:  That sounds more like summary judgment

15   material rather than a jurisdictional challenge.

16             MR. OLIVER:  Well, let's maybe go to the relevant

17   standard, actually, and the Fed Circuit has said in Norman

18   vs. The United States that to demonstrate illegal exaction

19   jurisdiction the plaintiff must demonstrate that there --

20   that the statute in question provides either expressly or by

21   necessary implication a remedy for the alleged unlawful

22   exaction.

23             And here, what our argument is is that the statute

24   upon which they're based does not have a remedy for

25   nonproportional assessment.  The statute does not guarantee

Northern California Power Agency, et al. v. USA

1    or require nonproportional assessment it requires that

2    Interior do it, and this -- our interpretation of the

3    statute, which is, I think, correct, it requires that

4    Interior strive to do everything it practically can to

5    achieve that goal, but it's not a guarantee.

6         And, so, I think in order to put this in context,

7    in order to understand what the place of this proportionality

8    mandate is in the statute, we must understand how it

9    interacts with other statutory objectives that the Department

10   of Interior --

11        THE COURT:  But let's assume that the Plaintiffs'

12   allegations are correct, and I think we must assume that for

13   purposes of a motion to dismiss, if the Plaintiff says that

14   the Government has charged them too much money, can't they

15   file suit here and get it back?

16        MR. OLIVER:  Well --

17        THE COURT:  Even under the Norman standard.

18        MR. OLIVER:  No.  We'd argue no, they cannot

19   because their theory -- their claim as to how they can get it

20   back has to match up with the statutory language.  They can't

21   just claim that, well, money was taken from us and there's a

22   statute out there that entitles us to it.  We have to --

23   actually have to look under Norman.  You have to actually

24   look at the statute and determine whether or not the statute

25   either necessarily expressly, which the courts have not --

Northern California Power Agency, et al. v. USA                    6/17/2015

1    you know, expressly provides a remedy for the unlawful

2    exaction or by necessary implication.

3           Our argument is that it -- that the statute, given

4    the language that Congress intentionally inserted into the

5    relevant provision, that shall to the greatest extent

6    practical achieve proportionality, that Congress is saying

7    that proportionality is not a guarantee; proportionality is

8    not a right; it is a goal that we want Interior to strive

9    toward.  And the reason -- and it's important to take -- to

10   understand the context of this, because this statutory goal

11   of proportionality is -- must be understood in relation to

12   other statutory objectives that are related to it.

13          In Section 3407, there is a -- there is a $30

14   million -- there is a provision that provides that Interior

15   is to assess up to $30 million on a three-year rolling

16   average for both water and power users.  And, importantly --

17   actually, 3407(c) is, to the extent required in the

18   Appropriations Act, the Secretary shall assess these

19   additional -- these payments.

20          Now, as we argue in our briefs, the appropriations

21   each year has directed Interior to assess the full amount,

22   the $30 million.  And, so, one competent -- so, one statutory

23   objective is you must collect this $30 million from water and

24   power.  The second one that's related is the fact that

25   Congress capped how much water could be assessed with respect

Northern California Power Agency, et al. v. USA                    6/17/2015

1   to this $30 million.  It did not cap power, but it did cap it

2   with water, specifically in 3407(d), it provides that the

3   maximum that water can be charged would be $6 per acre-foot

4   for agricultural users and then $12 per acre foot for

5   municipal.

6           But the point is, is that if you -- if you're going

7   to say you must collect $30 million from these users but then

8   you cap how much water is going to be charged, then power's

9   contribution to this fund is going to necessarily vary with

10  what water can do in a particular year.  So, if there's a

11  drought, as has been the case, I'm sure Your Honor is aware

12  in California, if there's a drought and water is not able to

13  produce a lot, then that's going to necessarily affect how

14  much power is going to be able to contribute to -- or has to

15  contribute in order to meet that $30 million statutory

16  objective.

17          And, so, that affects proportionality, because then

18  Reclamation is stuck with -- or faced with a situation where

19  if water's not delivering and therefore power has to

20  contribute more, then that affects how much they can achieve

21  proportionality.  And all this ties back to the remedy

22  because, again, Congress is saying this is a goal, we want

23  proportionality, yes, it's a good thing, and, yes, you shall

24  ascribe to it, but you might not reach it.

25          THE COURT:  Hang on just one second.  I don't know

Northern California Power Agency, et al. v. USA                    6/17/2015

1     whether the Plaintiffs are going to prevail on the merits or
2     not, but they have alleged that there's a problem in the way
3     in which the fees have been assessed, that they've been
4     required to pay too much.  Can't this Court hear their claim?
5          MR. OLIVER:  Well, I would argue under this statute
6     and under -- based upon what their claim is, no.  They don't
7     have jurisdiction, and the reason for that is that their
8     claim -- the reason they think that they have paid too much
9     money, they're very clear in their complaint.  And I think
10    that's what we must focus upon, what is their claim, because
11    Norman says what -- focus on the remedy that's implicit from
12    the statute if we want to understand what their claim is.
13          Their claim is that there is a right to
14    proportional assessment and, therefore, the difference
15    between what they're being assessed and what would be a
16    proportional assessment is what they're owed.  That's the
17    basis of their claim.  That's the basis of their illegal
18    exaction claim.  So, the question, then, as a matter of
19    jurisdiction, is, well, does the statute imply a remedy for
20    that situation.
21          And the answer would be yes, if Congress had
22    adopted the earlier version of this bill, which says that --
23    that the water users and power users shall be assessed in
24    proportion to their repayment allocation share.  And,
25    clearly, we have illegal exaction -- regardless of the

1    merits, we clearly -- the Court would have jurisdiction

2    because they're claiming we're being assessed beyond what was

3    proportional.  But that doesn't match up.  That goes back to

4    my original point about their disconnect.  That's not what

5    the statute says.

6            THE COURT:  Well, I think I can still hear about

7    whether or not the Government has met this goal.  I mean,

8    that sounds like a fact inquiry to me, and on which I should

9    hear evidence.  But to me it doesn't mean that I can't hear

10   the case.

11           MR. OLIVER:  Well, if their claim was that they're

12   owed the difference between what Reclamation can do using its

13   best efforts and given what's practical versus what they're

14   being assessed, that might be one situation, but the

15   complaint was fairly clear about what their claim is.

16           And if they're going to change their claim and so,

17   oh, no, we're actually just going to argue that we're just

18   owed the difference between the best that Reclamation can do

19   under the circumstances, given these various statutory

20   objectives and what they're assessed, okay, but if that's the

21   battlefield, then we're certainly -- we're willing to -- you

22   know, we're willing to go under that, and we think that --

23   you know, if that's their claim, then, certainly, you're

24   right, summary judgment is where we should go and figure out

25   if there's any difference.

1          We argue that there's not for the reasons we

2    mentioned.  But reading their complaint, that is not what

3    they're saying.  They're saying that we have a right to a

4    proportional assessment; you're assessing beyond that; give

5    us the difference.  That's the illegal exaction.  If that's

6    their claim, and I'm sticking -- I'm sticking to what they've

7    articulated in their complaint.  They could have articulated

8    something different; they didn't.  They articulated a

9    complaint, an illegal exaction claim, specifically based upon

10   a failure to achieve proportional assessment, which rests

11   upon the premise that there is a right to proportional

12   assessment.

13          Most illegal exaction claims, Your Honor knows,

14   this is not even an issue.  You have a statute and there's an

15   exaction of a fee or some amount of money.  The question is

16   was that illegal exaction or not.  It's not return of the

17   money.  So, the issue of, well, does the statute imply,

18   remember, it normally doesn't come up because usually it

19   does.

20          But in the case here, where Congress was very

21   intentional about inserting this language about to the

22   greatest extent practical, that does throw a wrench and that

23   does throw -- that poses a jurisdictional issue and a

24   jurisdictional problem as to what is the remedy here based

25   upon what their complaint is.  And, so, I would argue that

1   this squarely is a jurisdictional issue, that it rests upon,

2   you know, again, that disconnect between what their claim is

3   and what the statute actually says and provides.

4           And, so, I want to stress that we're not arguing

5   that Reclamation doesn't have any duties whatsoever with

6   respect to proportionality.  I mean, I think in their brief

7   they're suggesting, oh, well, the Bureau of Reclamation has

8   unfettered discretion, this can't be the case that there's no

9   remedy here and they can do whatever they want.  That's not

10  the case.  The language does say "shall" to the extent -- to

11  the greatest extent practical achieve proportionality or it

12  shall -- you know, it shall be proportional.

13          So, they have an obligation to strive for that, and

14  I think that -- and, so, for instance, if -- and this is not

15  the case, but if the Bureau of Reclamation, for instance,

16  were not charging the full amount of water, you know, the

17  limits 6 and 12, you know, they would say, oh, we're going to

18  charge them 3 and 2 instead or something -- a similar random

19  lower figure, then that could be -- they'd know, you actually

20  have to charge the maximum because you have to max -- you

21  know, that's irrational and arbitrary, irrational to charge

22  us -- you know, to -- even more than what the statute would

23  provide.  You know, that's not the case here.

24          If -- and I'll also point -- to underscore my point

25  about, you know, their argument that, well, what obligation

 1    does the Bureau have at all, the notice -- I think they

 2    submitted a notice of authority yesterday or the day before,

 3    two cases, one of which, the Department of Transportation vs.

 4    Association of American Railroads, and the subject matter of

 5    the case isn't really relevant, but the subject matter is

 6    whether or not -- or the holding, rather, is whether Amtrak

 7    is a governmental entity for purposes of their establishing

 8    metrics and standards as to, you know, trains being on time

 9    and so forth, and the Court found that it was.

10          But the more -- the part that perhaps has some tie

11    to this case is the language and the relevant act for that

12    case, the Passenger Rail Investment Improvement Act, so that

13    Amtrak and private rail carriers shall incorporate those

14    metrics and standards into their agreements whenever

15    practicable.

16          And, so, in their notice they focused on the

17    concurrence of Alito and Thomas.  We'll start with Thomas.

18    Thomas said that the metrics and standards met -- satisfy the

19    common carrier obligations to provide -- well, what I just

20    said, Amtrak shall and its carriers shall include the metrics

21    in their contracts to the extent practical.  And then Thomas

22    says, as Justice Alito explained, it matters little that the

23    railroads may avoid incorporating the metrics and standards

24    as far as that incorporation is impracticable.  The point is

25    that they have a legal duty to try.

Northern California Power Agency, et al. v. USA                6/17/2015

1          We completely agree with that in terms of our

2     case, a legal duty of Reclamation to try to achieve

3     proportionality, but the point is is that it's a goal.  It's

4     a goal.  It's not a guarantee.  Their claim -- their illegal

5     exaction is premised upon the notion that it is a guarantee

6     and, therefore, we're owed money because you guys did not --

7     you assesses us in a nonproportional fashion.

8          So, as I mentioned before, that disconnect poses a

9     jurisdictional problem here because there is not a remedy for

10    nonproportional assessments, which is what their claim is.

11         THE COURT:  Well, we'll take a close look at the

12    complaint again just to fully understand that, but it seems

13    to me that surely I can hear the Plaintiffs' case on whether

14    the Government has done a reasonable effort to meet their

15    goal.  I mean, I don't know what the evidence will show, and

16    as I said, I don't know if they'll prevail, but it seems like

17    this is a case that I certainly can hear.

18         MR. OLIVER:  Right, well, Your Honor, if what

19    they're alleging is that -- if their complaint is simply that

20    we did not do what -- we did not take, you know, the steps

21    necessary to practically achieve proportionality as opposed

22    to actually achieving it, if they agree our obligation is to

23    do the best we can to achieve it, even if we fall short, and

24    if that's what their complaint is, which is not how I read

25    their complaint, but if that's what it is, then -- then we

Northern California Power Agency, et al. v. USA                    6/17/2015

1    certainly will be happy to, you know, in summary judgment to

2    show that what the Bureau of Reclamation did, you know, is

3    actually all that they could do, you know, to achieve

4    proportionality for the reasons I mentioned.

5           Congress says we must meet $30 million, then -- and

6    water is capped at a certain amount every year based upon

7    what water can do, then power -- and they're charging power

8    exactly, you know, what they can under -- given the statutory

9    objectives that they are faced with.

10          THE COURT:  Yeah.  Well, as you know, I just

11   received this case a few days ago, and I assume I don't know

12   it as well as you gentlemen do just yet, so I'll go back and

13   take a close look at that.

14          MR. OLIVER:  Okay.  Pending further questions, I'll

15   reserve some time for rebuttal.

16          THE COURT:  Okay.  That's fine.  Thank you, Mr.

17   Oliver.

18          Mr. Ralston?

19          MR. RALSTON:  If it please the Court.  Your Honor,

20   I thought first I would respond directly to a number of

21   points in the colloquy between the Court and counsel, as I

22   think in many ways it frames the issues that are presented to

23   the Court.  I think the colloquy illustrates that the

24   Government is simply misreading the statute.  And its

25   approach to this is that if one reads the statute somehow as

1    being less than 100 percent a requirement, it does not create

2    a right.  It's misreading it.

3           Our complaint lays out, I think in detail, the

4    analysis of how the proportionality provision is to work.

5    The language is straight out there, and it requires that the

6    Government make an effort to the greatest degree practicable

7    to attain proportionality.  That's the standard.  And as the

8    discussion indicated, there is every reason why the Court can

9    hear a claim that is predicted upon the Government's failure

10   to the greatest extent practical attempt to do

11   proportionality here, the result of which is that NCPA and

12   its members have overpaid and thus seek to get the return of

13   those funds.

14          And the -- in a sense, the Government really has in

15   its motion and even really in argument, conceded that they

16   did not try to attain material proportionality.  And I'll

17   show in just a moment as I walk through some of the exhibits

18   that the Government has essentially ignored it in terms of

19   its efforts.  Now, again, that's ultimately for summary

20   judgment -- I recognize that -- but for purposes of the

21   motion, the complaint and their motion demonstrate that over

22   the course of time that's relevant here they have ignored the

23   proportionality requirement, not made the effort at all to

24   attain it.

25          We're not discussing, as I'll show, a 1 or 2

Northern California Power Agency, et al. v. USA                                      6/17/2015

1    percent difference here.  This is an order of magnitude where

2    there exists proportionality that is almost 50 percent over a

3    period of time that the statute has been in effect.  I would

4    suggest that counsel's argument really goes to damages and

5    not to the issues of jurisdiction, not to the issue of

6    stating the claim, and that NCPA is clearly within the zone

7    of interest of the statutory protections of proportionality,

8    as I'll develop in somewhat greater length.

9            I thought it would be helpful for the Court for me

10   to begin my analysis today with walking through the operation

11   of the statute, and I think that's best illustrated or worked

12   through, Your Honor, by inviting the Court's attention to the

13   Complaint Exhibits 3 and 4, if the Court has that, and I do

14   have copies here if it would be helpful to the Court.

15           THE COURT:  I don't think I brought the complaint

16   down with me.  I do have all of the briefs.

17           MR. RALSTON:  If I may approach, Your Honor.

18           THE COURT:  Sure.

19           MR. RALSTON:  Exhibits 3 and 4.

20           And, Your Honor, I'll also be working through and

21   correlating this with sections of the Government's motion so

22   that I can help the Court, in essence, correlate those

23   various provisions in there with our exhibit.

24           If I can approach again.

25           THE COURT:  Thank you.

Northern California Power Agency, et al. v. USA

1          MR. RALSTON:  And, finally, I thought it would be

2     helpful if the Court has a copy of the statute, if you have

3     it available.  I do have copies of that, as well.

4          THE COURT:  Why don't you give it to me.

5          MR. RALSTON:  If it would be of help.

6          THE COURT:  I know it's here somewhere.

7          MR. RALSTON:  I should say excerpts from the

8     statute, the specific Section 3407 of the Central Valley

9     part.

10          So turning to exhibit -- first Exhibit 3, Your

11     Honor, it will somewhat set the stage.  That shows you the

12     invoice that comes to the Northern California Power Agency,

13     the lead Plaintiff in this matter.  And as you can see, it is

14     from the Western Area Power Administration.  What the area

15     power administration essentially is, an agency of the Federal

16     Government that handles the distribution of power on behalf

17     of the Department of Energy in the western parts of the

18     United States, including California.

19          And this is an invoice, as you can see, this is

20     from June of 2014, in which essentially NCPA is being billed

21     for its Restoration Fund charge for that month.  And that's

22     how this is administered.  They receive a monthly invoice for

23     one-twelfth of the estimated amount that is then -- it's

24     first estimated and then trued up at the end of the fiscal

25     year based on the formulas that we're going to go through.

1            Exhibit 4 is a spreadsheet that was prepared by the

2     Western Power -- Western Area Power Administration, an agency

3     of the Department of Energy.  And as we set out at paragraph

4     58 of our complaint, we give you the background of how this

5     chart came to be.  It was, apparently, originally the date

6     originally drawn from the Bureau of Reclamation, and then

7     updated by the Western Area Power Administration to

8     effectively demonstrate the extent of the disproportion

9     overpayment by power under the Central Valley Project

10    Improvement Act.

11           And I'm going to begin and end, really, with this

12    exhibit, the ultimate point being down in the far right-hand

13    corner of the exhibit, Your Honor, you'll see the number

14    $87,340,245.  That reflects the total of the disproportionate

15    payments by power from the beginning of the Act in 1993

16    through FY 2013.  When we filed the case in August, FY 2014

17    was not yet finished, and so you only have the projected

18    revised number right beneath there for that year, and as you

19    can see, according to the Western Area Power Administration,

20    the projected disproportionate amount for that year alone

21    would be $40,983,092.

22           So, you can see the order of magnitude of the

23    disproportionate year with that added in is -- they actually

24    give you the number, $128 million.  That is compared, if you

25    go two lines before that, two columns, you'll see

1    $183,449,000 is what should have been paid, had it been done

2    proportionately, and so the difference, 183 versus the 87 by

3    FY 2013, was already almost 47 percent more to give you that.

4    And that essentially, in a broad way, sets out our concept of

5    what the damages would look like.

6            I would add that this chart doesn't exactly track

7    the implementation of the statute, for one reason is, as the

8    Court probably has observed, there's a ten-year rolling

9    average analysis that's part of the proportionality that

10   Congress inserted to level out the situation, because the

11   Bureau of Reclamation hasn't done a Central Valley Project

12   repayment update since 1975, despite a congressional

13   instruction to do it in 1988 by 1993, so we're still waiting

14   for them to update the 40-year-old records, there isn't a

15   definitive number.

16           So, apparently Reclamation and then Western had to

17   undertake, essentially, what is in column 6, the ten-year

18   rolling average capital analysis as a proxy for what would

19   have Congress expected to be done by the Bureau of

20   Reclamation.  So, there are some differences between how the

21   statute strictly played out would be represented, but the

22   differences, I really don't think, are material for purposes

23   of what I'm going to be discussing today, Your Honor.

24           I will say that as a general matter this does lay

25   out the concept of how we approach the statute.  It

Northern California Power Agency, et al. v. USA                                6/17/2015

1    correlates with what is in the Government's motion, as I'll

2    show in a moment.  And I think it demonstrates that our

3    discussion of the facts in our opposition and in our

4    complaint as to how the statute operates, the proportionality

5    controls over revenue maximization, which is really the issue

6    here that's being joined, and the sum certain.

7            The Court may have noticed that one of the

8    arguments -- one of the complaints that the Defendant raises

9    is that the proportionality requirement doesn't lend itself

10   to a sum certain.  As I just went through, the Western Area

11   Power Administration, an agency of the Department of Energy,

12   found it quite capable of using a spreadsheet to be able to

13   term the overage down to $87 million, pretty close to a sum

14   certain, it would appear, to us, we would suggest.  And, so,

15   to the extent that there is an argument that somehow a sum

16   certain doesn't flow from the proportionality requirement, I

17   think we can put that aside by virtue of Exhibit 4 in showing

18   that.

19           Now, I recognize that this presents an approach to

20   the statute that differs from that which the Government has

21   taken.  And, obviously, I understand the Department of

22   Justice has the opportunity and the right to choose between

23   competing views of what its agencies may believe.  And, so,

24   it's chosen to follow the Bureau of Reclamation's versus

25   Western Area Power.  But I would point out that our position

Northern California Power Agency, et al. v. USA                6/17/2015

1    is consistent with the position that Western Power has laid

2    out here in Exhibit 4.

3              To give the perspective from the Plaintiffs'

4    perspective of the overage that I've -- that Western Area

5    Power shows here of $87 million, the Northern California

6    Power Agency is roughly 40 percent of that.  So, NCPA is

7    roughly 40 percent of the total power user market of the

8    Central Valley Project.

9              Let me now turn to page 5 of the Government's

10   brief, and 6, where they lay out the charges that are

11   applicable.  And you'll -- Your Honor, at those pages, there

12   are a total of six charges.  The nomenclature may differ

13   somewhat from what is in our complaint and our opposition,

14   but we have a footnote in our opposition that explains the

15   difference, if the Court needs to go back and see that.  But

16   for purposes of our argument, let's -- I'll accept this

17   presentation because it will correlate with the Government's

18   Exhibit 4, essentially.

19             The first charge you see is called "The Mitigation

20   Charge."  We refer to it as "The Additional Mitigation

21   Charge," because it, in fact, is the last charge that's

22   imposed in this hierarchy.  If the other charges that I'm

23   going to go through are looked at first and if they exceed,

24   for example, $20 million, then the $30 million not-to-exceed

25   cap is actually going down.  So, to the extent that charges

Northern California Power Agency, et al. v. USA                    6/17/2015

```
 1    2, 3, 4, and 5, exceed $20 million, it reduces the cap, so to
 2    speak, of the mitigation charge.  So, it's the last one
 3    that's looked at.
 4            The mitigation charge is established in a critical
 5    section, 3407(d), that really is the focus of our entire
 6    analysis.  It is the section that contains, also, all of the
 7    limits that are relevant here, the $30 million not-to-exceed
 8    on this charge, the $6 and $12 per acre-foot, depending upon
 9    which category of water you're in, and the proportionality
10    requirement as well.  It is the limitation section, as well
11    as the establishment of the charge.
12            This is the only charge applicable to power.  All
13    of the other charges that I'll discuss this morning are water
14    only.  This is water and power under this one.  Under "The
15    Friant Surcharge," number two, and three, the contract
16    renewal and the water transfer of tiered water are all water.
17    And then number six, "The Municipal and Industrial
18    Surcharge," also water.  Numbers one and six both come out of
19    the 3407(d) sections, which is why in our complaint we
20    combined them, but the Government has presented them
21    separately.
22            As you can see from the Government's discussion in
23    paragraph one, it discusses a number of those limits and it
24    ends its paragraph with saying it contains, among other
25    things, other requirements.  Well, among the other
```

Northern California Power Agency, et al. v. USA                          6/17/2015

1    requirements, of course, is the proportionality requirement

2    that brings us today here, and thus essentially the

3    Government acknowledges it is a requirement.

4            With that, let me turn to page 9 of the

5    Government's brief and do a correlation between those charges

6    and page 9.  Page 9 provides a Table 1, a chart, that shows

7    you the Central Valley Project Repayment Allocation.

8    Repayment allocation, as counsel indicated, is essentially,

9    for lack of a better term, the capital contribution

10   repayments that water and power make over time to reimburse

11   the United States for its investment in the Central Valley

12   Project.  And it's my understanding that that capital

13   allocation repayment is built into the rates, essentially

14   that they pay for water and power.

15           So, Congress used essentially the capital

16   contribution position as the benchmark, as the metric, for

17   the proportionality analysis.  And you can see that the

18   Government breaks it out over these fiscal years.  It shows

19   you agriculture as a water user and municipal and industrial

20   water, and it gives you the respective capital contributions,

21   which total together 76 percent.  By contracts, power is at

22   24 percent.

23           So, when we're talking about the respective

24   proportionality, it's this 76 and 24 that's the predicate.

25   And as their footnote notes, this is from 1975, and this is

1    the study I mentioned earlier, Congress said in 1998 they're

2    supposed to update by 1992 or '93 and it has yet to be

3    updated as their footnote indicates, not yet occurred.  So,

4    for purposes of my discussion today, I'm looking or would

5    suggest to the Court, the 76/24 essentially is the

6    proportionality analysis.

7             And if you go back to pages 5 and 6, you can see in

8    terms of the charges that what's being developed here in

9    terms of the agriculture and M&I, that analysis, the 76

10   percent, comes from all water and power users.  So, it's not

11   just an analysis of the mitigation charge; it's over their

12   overall use.

13            And, finally, with that, let me invite the Court's

14   attention to Appendix 17, which is the actual statute, and

15   then I'll walk through to try to correlate that with the fees

16   I just went through for you.  The first fee, which is the

17   mitigation fee, or as we call the additional mitigation

18   charge, is provided for in 3407(d)(2) -- (d)(2)(A), where it

19   says, "The Secretary shall require Central Valley Project

20   water and power contractors to make such additional annual

21   payments as are necessary to yield...with other receipts, the

22   amount required under paragraph (c)(2)."  So, these

23   additional payments are determined by going to (c)(2).

24            (c)(2) tells us what's to be collected.  In (c)(2),

25   it says that the payment in each fiscal year shall be an

1     amount "reasonably expected to equal the amount appropriated

2     each year" -- comma -- "subject to subsection (d) of this

3     section."  So, the amount that is referenced in (c)(2) is not

4     the amount appropriated this year; it's not the amount that

5     the Bureau of Reclamation would like to collect.  It's the

6     amount appropriated as modified by the limits that we'll

7     discuss again in section 2 -- (d).  Very clear.

8            Two or three or four lines down from there,

9     Congress then said, but if after 1998, that Congress doesn't

10    appropriate more than $50 million, we'll set $50 million as a

11    benchmark after 1998, and that's about four lines down, where

12    it says that "the Secretary shall impose such changes in

13    fiscal year 1998 and in each fiscal year thereafter" -- comma

14    -- "subject to the limitations in subsection (d) of this

15    section."  So, even in the second provision -- there's the

16    first and then the second -- Congress was unmistakable that

17    in setting the (c)(2) amount it was to be subject to the

18    subsection (d) limitations.

19           I'll refer to -- we refer to that subsection (d)

20    essentially as the fairness section because it maintains

21    those limitations that are applicable here.  And as you can

22    see from this, all roads leading to the fairness section

23    require that they are subordinate to the fairness section.

24    So, Congress' instructions for the collection of money

25    clearly made the collection of money secondary, subordinate

1    to, the limits in subsection (d).

2              And even the annual appropriations act, which the

3    Government has provided as an appendix to their reply, it

4    says the amounts, as authorized, in other words to remain

5    here, is what the general language is, amounts as authorized

6    by subsection (d).  So, again, every road indicates that the

7    duty to collect revenue is subordinate to the limitations

8    that are contained in subsection (d).

9              We briefly mention the limits in subsection (d).

10   First you have the not to exceed -- this is (d)(2)(A), the

11   additional payment shall not exceed 30 million, as adjusted

12   for inflation.  So, that is the -- going back to again the

13   Government's page 5, the mitigation charge, number one, is

14   not to exceed 30 million, as adjusted for inflation.  Second,

15   there is a per acre-foot limitation of $6 and 12.  And that

16   correlates back to the Government's page 9 chart, whereas

17   agriculture and M&I, agriculture is the 6; M&I is the 12.

18             Those are simply caps on the rate.  It is not a cap

19   on the amount, because the amount to be paid is a function of

20   the rate times the number of acre-feet of water that the

21   Bureau release.  At a number of points in the Government's

22   reply, they talk about cap on amount arising from 6 and 12.

23   The Government -- Congress has not capped the amount.  It's

24   capped the rates applicable to the delivery of water based on

25   acre-feet.

1          And, finally, in the very last sentence of that

2    section, we come upon the language that brings us before you

3    today.  "The amount of the mitigation and restoration payment

4    made by the Central Valley Project water and power users" --

5    comma, I'll underscore, my underscore -- "taking into account

6    all funds collected under this title, shall, to the greatest

7    degree practicable, be assessed in the same proportion,

8    measured over a ten-year rolling average, as water and power

9    users' respective allocations for repayment of the Central

10   Valley Project."

11         Thus, you can see from that language that the

12   proportionality provision does not just impact the mitigation

13   payment, the number one charge in the Government's brief.  It

14   says take into account all of the funds that power -- I'm

15   sorry, that water pays under these charges, and when you do

16   the proportionality analysis, take into account all that

17   water has paid and use that to calculate, in effect, the

18   proportionality calculation.

19         Thus, the proportionality version is broader than

20   simply the mitigation charge and provides essential

21   protection for power because the result is it actually links

22   water and power.  So, if -- I'll use the extreme example the

23   Government might suggest.  If there were zero water releases

24   from the Central Valley Project in a given year, zero,

25   obviously the mitigation charge for purposes of water would

1    be zero, because six times zero is zero and 12 times zero is

2    zero.  And the charges would all be zero for no releases for

3    water.

4           I add there would be no power because if there's no

5    water release, there's no turbines running, and, in fact, the

6    power would stop long before the water ran out because they

7    would reach critical dam levels where they couldn't.  In that

8    circumstance, we'd go to the proportionality analysis under

9    our approach.  Water has paid zero; 25 percent of -- 24

10   percent of zero is zero.  Power would also not pay.

11   Absolutely fair.  Water is not getting any water; power is

12   not getting any power.  There's nothing to be remediated.

13   The fish arguably aren't even getting the water under that

14   scenario.

15          By contrast, under the Government's analysis, power

16   would be delivered a $30 million bill under their scenario,

17   because under their scenario, the revenue maximization

18   somehow trumps the protections I've just gone through, allows

19   them to ignore the fairness section that I've just gone

20   through so that they can maximize the revenue in that

21   scenario.  And I would suggest to you that Congress could

22   hardly have had that as an expected result here, particularly

23   when you consider -- if I may invite the Court just to go

24   back briefly to 3407(d) again.

25          And you'll see in (d)(1), Congress set out an

1    elaborate estimation process at the -- prior to the fiscal

2    year, telling the Secretary how to go through the process, do

3    the estimate, taking into account these various issues, and

4    in that analysis, all of these limits would be at play in

5    terms of the calculation.  And at the end of it, the final

6    thing that would be determined would be proportionality.

7              And for proportionality, as you can see at the end

8    of (d)(2), Congress has a very detailed approach.  First we

9    take into account all the funds in the title, so Congress

10   clearly envisioned its macro approach there, measured over a

11   ten-year rolling average.  Obviously very concerned that this

12   would be leveled out over a multiyear period, and based on,

13   as we saw, the metrics of the Central Valley Project

14   repayment.

15             So, the suggestion that somehow this was hortatory

16   in the process simply ignores the operation overall of this

17   section of the statute in its operation as well with (c)(2)

18   and its internal operation.  Our complaint lays that out, we

19   think persuasively, in terms of that Congress certainly

20   intended far more than hortatory analysis.

21             And I would think, now reaching back to counsel's

22   argument, that the motion and counsel acknowledge that if the

23   greatest degree practicable language were not in the section,

24   there'd be no question about jurisdiction, about enforceable

25   right.  Does the great degree practicable language alter the

1    whole scheme because it is inserted by Congress to, in

2    essence, give some flexibility to work through this process?

3            And as you can see from the process that I've

4    analyzed, and I'll come back now and walk through the chart

5    for you, there needs to be obviously some elbow room here in

6    terms of doing these calculations.  It begins with an

7    estimate; ends up with a true-up at the end of the day.

8    Trying to attain mathematical proportionality, particularly

9    when the Bureau hasn't, at this point in 40 years, done an

10   update to the Central Valley Project repayment allocation,

11   would be a challenge, but the arguments here are not over 1

12   percent or 2 percent.  They're over whether they've done it

13   at all at the end of the day.  That's been joined here.

14           With that, let me briefly return to Exhibit 4 and

15   walk that through for you so you'll now, I think, see how I

16   correlate each of these pieces.  The first column on the

17   left, the fiscal year, obviously this is the Federal fiscal

18   year, that's what's being based.

19           The first column entitled -- second column,

20   sorry -- 3407(d)(2)(A), that shows you the combined payments

21   by power and water.  So, it's essentially the combination of

22   columns 3 and 4.  It's the total of those two.

23           The power column, column three, is what NCPA and

24   its other power colleagues have paid in those respective

25   years.  As you can see, the total number at the bottom is

Northern California Power Agency, et al. v. USA

```
 1    $270,789,000.  As I understand it, the water column is --

 2    reflects, going back to the Government's brief, mitigation

 3    charge one and six.  Both come out of the (d)(2) section of

 4    the statute.

 5            And the other, the next column, reflects all of the

 6    other charges that are collected over that time.  And, so,

 7    the total picture of power, water, and other -- in essence,

 8    all of these charges is given in the column that says

 9    "Total."  And you can see that the total collections under

10    this program over the 20-plus-year period have been almost $8

11    billion.  And that money goes to the Bureau of Reclamation.

12    That's who essentially spends it.  It's designed effectively

13    to cover the appropriations made and then essentially charged

14    to these various participants that are laid out here, over

15    the 20-year period of almost $1 billion.

16            The next column gives you the percentage by year of

17    what power has paid compared to the water and others.  And as

18    you can see -- I'll just use as the example 2013, 37.89

19    percent.  WAPA then compares that to the next column for that

20    year, that the capital repayment average, as they calculate

21    it, would be 24 percent.  So, that difference right there,

22    that 13 percentage points, effectively represents the

23    disproportionality, which as you can see at that point is

24    over 50 -- almost 50 percent, over 50 percent for that year.

25            The next column gives what power should be paying.
```

1    And the final column gives you the difference, essentially

2    the difference between what they should be paying versus what

3    they did pay, which is back at column three.  That's

4    essentially how the statute operates.  And the last point I'd

5    make is as you can see in terms of proportionality analysis,

6    it's a total picture.  It's power as compared to water and

7    other, not just water, in terms of the mitigation charge.

8            I'll spend a few moments, if I may, Your Honor,

9    just touching on the jurisdictional points -- I'm sorry,

10   before I do that, let me give a couple summary comments in

11   terms of the chart.  As I mentioned earlier, the

12   disproportionality here is over that 20-year period almost 50

13   percent.  And you can see from FY 2005 on there is

14   effectively a complete lack of effort to accomplish

15   proportionality after 2005.  And you can see that --

16           THE COURT:  Let me ask a question.  What exactly is

17   the true-up process that you described that occurs at the end

18   of the year?

19           MR. RALSTON:  Yes, Your Honor, it's my

20   understanding --

21           THE COURT:  How do end up with such a large

22   disproportionality if you're doing a true-up?

23           MR. RALSTON:  In effect, what occurs, as I

24   understand it is when they do the true-up, the Government --

25   the Bureau of Reclamation has said as they've said

Northern California Power Agency, et al. v. USA

1    essentially in their motion, well, we go to (d)(2), and we

2    see that number 30 million that says "shall not exceed."  We

3    call that a minimum.  So, you water and power folks owe us 30

4    million.

5              We've done the water analysis under the mitigation

6    number one charge, and at $6 and $12 times X acre-feet of

7    water -- I'll use an example -- but you can see right in the

8    chart if you want an accurate example, it's only 5 million.

9    So, power, here's your invoice for $25 million.  So, the

10   true-up is a true-up effectively under their analysis at the

11   end of the year.  That -- so, it isn't a true-up on

12   proportionality.  They ignore proportionality and just send

13   us an invoice for the difference between whatever power --

14   sorry, water put in and power makes up the difference.

15             That essentially is the Government's scheme, is

16   that at the end of the day, they run that number and if there

17   is some difference between what power -- water has put in,

18   I'm sorry, under the mitigation charge and 30 million, power

19   pays the difference.  And, so, my example, if there were no

20   water at all, the bill to us would be $30 million under their

21   theory, both as originally estimated and as trued up at the

22   end of the day for that.

23             As we understand the Government's argument, it's

24   that the term "greatest degree practicable" was put into the

25   bill -- into legislation so that they didn't have to do

Northern California Power Agency, et al. v. USA                    6/17/2015

1    anything at all on proportionality.  So, as we read it,

2    Congress says go to the right and do the greatest extent

3    practicable in doing proportionality, and the Bureau of

4    Reclamation reads it, no, no, no, it means we don't have to

5    do anything, we can elect in terms of their interpretation.

6    And I think that illustrates how off the mark they are in

7    terms of their misreading of the statute.  They don't even

8    look at proportionality as the example in that chart

9    indicates.

10          And it strikes again us that Congress has set up a

11   very detailed formula and approach here and it all runs

12   contrary to the argument that this isn't a requirement, that

13   it's somehow a goal.

14          I'll also point out that in the 20 years -- 20-plus

15   years of the Central Valley Project Improvement Act, there

16   has been no rulemaking by the Bureau of Reclamation

17   expressing the positions that have been asserted in the

18   motion, in this litigation.  So, we're not talking about the

19   Court reviewing reasoned agency decision-making here.  It has

20   never been subject to notice and comment.  They've done a

21   couple of putative runs and they've talked about they're

22   going to do it and never carried forward.

23          So, the arguments that you see in the motion

24   essentially are arguments of counsel in terms of how the

25   situation came about.  Now, the chart illustrates they've

```
 1    ignored proportionality.  I don't dispute that at all, but
 2    when you get beyond that, there is no official notice and
 3    comment rulemaking position by the agency here.
 4              Let me turn briefly onto the jurisdictional points.
 5    We set out at our brief, opposition brief 9-10, the basic
 6    requirements for an illegal exaction case.  In our view, laid
 7    out under the Aerolineas Argentinas and Eastport decision,
 8    requiring that the Government -- that the Plaintiff show they
 9    paid money to the Government here directly and seek a refund
10    of it in the amount that was improperly paid or exacted.  As
11    we indicated in our notice filing yesterday, Your Honor has
12    issued the decision in the Starr International case --
13              THE COURT:  I'm somewhat familiar with the case.
14              MR. RALSTON:  -- you're more than familiar with
15    these points, and there's nothing that I could add to the
16    substance of that knowledge at this point, other than to give
17    you some comments in terms of how this case seems to fit
18    within that framework.  Your decision clarified that there
19    really are two strains of thought here with respect to the
20    standard.  The one that seems not to encompass the money-
21    mandating requirement expressly and then the Norman line of
22    cases that do.
23              In this case, I'd suggest that that distinction
24    really is not going to be of import because the exaction here
25    readily meets the Norman standard.  It is akin to a tax or
```

1    awfully close to a tax, which as the Starr decision points

2    out is the quintessential example of an illegal exaction.

3    And if you follow the application that the Bureau of

4    Reclamation has here, it is a tax because it's completely

5    devoid of any relationship to the proportionality

6    requirement.  So, if it's a tax, this Court has jurisdiction

7    to review it.

8         The implicit right to the refund arises from the

9    limit that the statute places on the Bureau's ability, the

10   Secretary's ability to collect the funds.  That's where it

11   arises from.  And proportionality, whether it has an element

12   of discretion or not, is obviously a limit on the Secretary's

13   ability to impose and assess the fines.  That by necessary

14   implication tees up illegal exaction jurisdiction.

15        And the Government, as I pointed out earlier,

16   admits that but for the greatest degree practicable language

17   the CVPIA is that kind of statute.  It would fall within the

18   money-mandating class.  And, candidly, how could they not

19   agree to that given that the CVPIA is an authorization

20   statute and it every year keys in with an annual

21   appropriations law.  I don't know how you could get much

22   closer to being money-mandating.  In some ways, that's more

23   money-mandating than the Fifth Amendment may be money-

24   mandating for takings purposes.  There's more specificity

25   here than there is the Fifth Amendment.

1          In the Cyprus Amax case with respect to the export

2    clause, an illegal exaction case, there's no sum certain

3    requirement in there, and yet the Federal Circuit had, at the

4    end of the day, no difficulty determining that the export

5    clause is an illegal exaction clause.  As I pointed out, we

6    are, if anything, closer to that and really in some ways

7    close to illegal exaction than the issues that the Court had

8    to review in the Starr International case.

9          The last point that I would make on that is that as

10   I said a moment ago, the Government's really only objection

11   is the discretionary aspect of the proportionality mandate,

12   and they cite it in response to us the Hinck vs. U.S. case,

13   64 Fed. Cl. 71 at 77 to suggest that this analysis isn't just

14   a superficial one, that one doesn't just go to our complaint

15   and look at it.  We're not suggesting that.  We have to

16   allege it in the complaint.  Of course, we recognize the

17   Court has to actually find that jurisdiction exists, it's not

18   simply a complaint analysis.

19         But even in the Hinck case, I invite the Court's

20   attention to that.  Judge Allegra laid out his standard o

21   what the not superficial analysis would be, and essentially

22   it is all we have to show is that there's a basis for the

23   claim of illegality here, that the collection is illegal.  We

24   readily meet that standard, and that's under the brief -- I'm

25   sorry, in the case the Government tells us is the demanding

Northern California Power Agency, et al. v. USA

1    requirement.

2          And I think really the last point I would cover,

3    Your Honor, is a few of the points that the Government has

4    made with respect to statutory history; for example, the fact

5    that they mention that in their argument.  The fact that the

6    clause was added in the course of the legislative process and

7    the greatest degree practicable clause, it's arguably called

8    even legislative history.  There's no explanation as to why

9    it was added.  We don't -- obviously, it is in the final

10   legislation, at the end of the day, and it's the one we've

11   operated with here.

12          Its addition, we've provided a number of ready

13   explanations of why Congress would have understandably

14   considered it needed.  Estimation, true-up process, the fact

15   that one has to deal with what happens on the ground in the

16   course of a year between the estimate and the true-up

17   process.  The Bureau of Reclamation had yet to do its update

18   on the Central Valley Project Improvement Allocation aspect.

19   And in some ways actually because it protects water, and I'll

20   take a moment to explain that because I think it helps

21   illustrate how the statute could operate.

22          If from the non-mitigation charges, so if from two

23   through five, in the Government's brief, in a year -- if $40

24   million were collected from that, the mitigation charge would

25   only be 10, the balance of the 50.  In calculating

1     proportionality, it is not just the mitigation charge,

2     however.  It is the whole picture.  So, if water has already

3     paid 40 million, which is 80 percent of the 50, exceeding the

4     76 percent that it's allocation percentage was, it owes

5     nothing more.  Power would pay the balance -- $10 million in

6     that case.

7            So, by virtue of the proportionality clause, water

8     actually gets the benefit at the end of the day.  It's

9     designed to protect water as much as it protects power under

10    that circumstance.  It is not unbalanced, and that goes

11    directly, I think, to counsel's argument that somehow there's

12    an imbalance of protection because water has a rate cap and

13    power doesn't.  Power buys its power through the Western Area

14    Power Administration, not from the Bureau of Reclamation

15    directly.  The CVPIA doesn't, as far as I know, govern

16    electric resources.

17           It made very good sense for a different treatment,

18    providing a global resolution and global protection for all

19    of the parties, which is just what the proportionality clause

20    does.  And we suggest to the Court that the Court should

21    follow, obviously, what Congress stipulated or lays out in

22    terms of taking a fairness approach versus the revenue

23    maximization that the Government has followed and that the

24    Bureau has followed.

25           With that, Your Honor, I appreciate the time that

1    the Court has given me and certainly am available for

2    questions.

3              THE COURT:  Yes, thank you, Mr. Ralston.

4              Mr. Oliver, would you like some rebuttal time?

5              MR. OLIVER:  Just briefly just to go over some --

6              THE COURT:  Sure, yes.  That's fine.

7              MR. OLIVER:  Counsel stated in his remarks that the

8    Bureau of Reclamation had made no attempt to achieve the

9    proportionality goal and if you look at page 9 of our brief,

10   which he gave you as an exhibit, the table, which shows the

11   CVP rate -- repayment allocation, saying 24 for power in the

12   right-hand corner, from '96 to 2005, that was the amount they

13   were assessed, the amount of the repayment allocation; where

14   in 1997 to 2006, 1 percentage over that.

15             The following year -- the following ten-year

16   average, '98 to 2007, again 25 compared to repayment

17   allocation of 24, the point being Reclamation was able to

18   achieve proportionality in the very beginning.  And what

19   changed?  What changed was what I mentioned in my earlier

20   remarks, the system -- and we're going to -- we're going to

21   get into this, you know, I assume.  In terms of how this

22   statute is set up, I mean, we spent a lot of time talking

23   about statutory interpretation, but under our interpretation

24   of the statute, what I believe is correct, you start out with

25   the 30 million, based upon the appropriation language, which

Northern California Power Agency, et al. v. USA

1    states that the Bureau of Reclamation is directed to assess

2    and collect the full amount of the additional mitigation and

3    restoration payments authorized by Section 3407(d).

4           So, my point about water, in terms of capping the

5    rate, well, if the water deliveries are low, that's going to

6    affect how much can be assessed, and that's exactly what

7    explains why the proportions started to increase over time,

8    is because water was not -- was not being assessed as much.

9    And what power could contribute is going to be tied to what

10   water can contribute, because $30 million is a mandatory

11   ceiling.

12          Their suggestion that it's not is based upon -- and

13   this all comes down to interpretation of the phrase "to the

14   greatest extent practicable."  And, again, I think they read

15   that provision or that phrase out of the statute for purposes

16   of their interpretation.  They read it as there should be a

17   right to proportionment, and if it's not proportioned, then

18   Congress has directed that through prorations that you assess

19   the full amount must be necessarily reduced, whereas our

20   interpretation is no, it doesn't say "shall be proportional,"

21   period.  It says "shall to the greatest extent practicable."

22   And given -- where that import, that means that it is a goal

23   but it may not be achieved in light of other statutory

24   objectives, including the $30 million.

25          I'll end on this minor point.  We spent some

Northern California Power Agency, et al. v. USA                                    6/17/2015

 1    time -- or we, actually counsel spent some time on Western

 2    Power Administration's invoice, Exhibit 3, and at one point

 3    stated that this was Western's position in this -- this

 4    represents WAPA's litigation position or its position on how

 5    it interprets the statute, whereas, in fact, this is simply

 6    their calculation of the amounts that -- the calculations of

 7    the assessments, that WAPA hasn't, as far as I know, taken an

 8    official position on this litigation.

 9              One second.  Let me confer.

10              (Brief pause.)

11              MR. OLIVER:  And one last thing I just want to

12    clear up.  You asked Mr. Ralston about the true-up process,

13    and I do want to clarify that.  The true-up process -- and

14    it's actually referenced in the statute in terms of

15    3407(d)(1) in terms of the Bureau of Reclamation at the very

16    beginning of the fiscal year -- prior actually to each fiscal

17    year will estimate the assessment, and then there will be a

18    true-up based upon the actual water deliveries that occurred

19    during that year because the assessment for water and taxable

20    power as well will depend upon how water -- you know, how

21    much water deliveries there are.

22              If it's fairly high, the ceiling, therefore, will

23    be higher because the rate is $6

24    per acre-foot, so if the water goes up high, the ceiling

25    that they can charge water will be that much higher.  So,

Northern California Power Agency, et al. v. USA                    6/17/2015

```
 1   that's -- that's the true-up process.

 2             THE COURT:  Okay.  All right.

 3             MR. OLIVER:  Unless you have any further questions.

 4             THE COURT:  No, I think I've got a good

 5   understanding of it.  Thank you, Mr. Oliver.  Thanks to both

 6   of you for your presentations today.  I will take the matter

 7   under advisement, and I'll have a ruling for you in the near

 8   future.

 9             (Whereupon, at 11:06 a.m., the hearing was

10   adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Northern California Power Agency, et al. v. USA                    6/17/2015

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3          I, Sara J. Vance, court-approved transcriber,

 4   certify that the foregoing is a correct transcript from the

 5   official electronic sound recording of the proceedings in the

 6   above-titled matter.

 7

 8

 9

10   DATE: 7/1/15                 s/Sara J. Vance

11                                SARA J. VANCE, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```