# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**NORTHERN CALIFORNIA POWER AGENCY**
651 Commerce Drive
Roseville, CA 95678-6411,

**CITY OF REDDING, CALIFORNIA**
777 Cypress Avenue
Redding, CA 96001,

**CITY OF ROSEVILLE, CALIFORNIA**
311 Vernon Street
Roseville, CA 95678

**And**

**CITY OF SANTA CLARA, CALIFORNIA**
1500 Warburton Avenue
Santa Clara, CA 95050,

**No. 14-817C**

(Judge Wheeler)

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

## AMENDED COMPLAINT

Plaintiffs Northern California Power Agency ("NCPA"), the City of Redding, California ("Redding"), the City of Roseville, California ("Roseville"), and the City of Santa Clara, California ("Santa Clara"), bring this Amended Complaint to recover damages for payments unlawfully assessed and collected by the United States of America, acting through the Bureau of Reclamation ("Reclamation") of the United States Department of the Interior ("Interior"). In support thereof, Plaintiffs aver:

**Introduction**

1.     This Amended Complaint seeks recovery of disproportionate overcharges unlawfully assessed and collected by Reclamation from Plaintiffs under the auspices of Section 3407, Title XXXIV, Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, 106 Stat. 4600, 4706-4731 (Oct. 30, 1992), codified at 43 U.S.C. § 371 note, a section of the statute commonly known as the Central Valley Project Improvement Act ("CVPIA").  The CVPIA, enacted in 1992, addresses the environmental impacts of the Central Valley Project (occasionally "CVP") in California, and fosters restoration of affected fish and wildlife habitats.  The Central Valley Project, first authorized by Congress in 1935 and then specifically reauthorized in 1937, is a labyrinthine network of dams, reservoirs, canals and aqueducts, extending over 400 miles from the Cascade Range near Redding in Northern California, to the Kern River, south of the City of Bakersfield, California.  Exhibit 1 provides a map of the CVP projects and system.  Virtually all of the CVP was constructed by Defendant, is owned by Defendant, and is operated by Reclamation's Mid-Pacific Region for Defendant.

2.     The CVP's primary purpose is the supply of water to California farms and communities.  In fact, Reclamation's Mid-Pacific Region's webpage on the CVP commences with this quote: "When asked what a newcomer should know about California, noted western writer Wallace Stegner answered with four words: **'Water. It's about water.'"** http://www.usbr.gov/mp/cvp/index.html (emphasis in original).  A screen shot of Reclamation's Mid-Pacific Region's webpage on the CVP, with the Wallace Stegner quote, is attached as Exhibit 2.

3.     Nowhere in California is the importance of water greater than in California's Central Valley, a fertile agricultural region that produces eight percent of the United States' total agricultural output (by value) and one-quarter of the nation's food, all on less than one percent of

2

the nation's total farmland. The Central Valley includes some of the most productive agricultural counties in the United States, and its farms serve as a leading source for a number of food products, including tomatoes, almonds, grapes, apricots, and asparagus. The Central Valley could not have become one of the world's most productive agricultural regions, however, without irrigation, as rainfall alone does not provide the regular supply of water needed to make Central Valley farms viable.

4. The need to harness and leverage California's scarce water resources for agricultural use by Central Valley farmers and for municipal and industrial use by the major urban centers in the San Francisco Bay Area led to the creation of the CVP, which has become one of the nation's largest and most ambitious water supply and conservation projects. According to Reclamation's Mid-Pacific Region, it manages through the CVP some 9 million acre-feet of water. An acre-foot of water is a unit of volume commonly used in the United States in reference to large-scale water resources, meaning the volume of water required to cover one acre of surface area to a depth of one foot. An acre-foot of water is approximately 326,000 gallons.

5. The CVP annually delivers seven million acre-feet of water for agricultural, urban and wildlife use, of which five million acre-feet irrigates approximately one-third of the agricultural land in California. Another 600,000 acre-feet, enough to supply the water needs of close to one million California households, is furnished for municipal and industrial purposes, and another 1.2 million acre-feet of water is dedicated to various mitigation and restoration purposes, such as fish, wildlife, refuges and wetlands, pursuant to the CVPIA. Defendant, through Reclamation, contracts with Central Valley water districts and farmers, California municipalities and other water users for the supply of CVP water for their agricultural, municipal

3

or industrial uses (collectively, "CVP Water Customers"). CVP Water Customers pay Defendant for the water they receive.

6.     While the need to store and transport water was the driving force behind creation of the vast Central Valley Project, the dams built as part of the Central Valley Project also created the opportunity for the production of hydroelectric power. Reclamation sells and conveys electric power generated by the CVP through the Western Area Power Administration ("Western"), an agency of the United States Department of Energy.

7.     Plaintiffs are among the California organizations and municipalities that have contracted with Western to receive CVP electric power (the "CVP Power Customers") and pay Defendant, through Western, for the power they purchase. Either as part of the per-unit charge for the power and water received, or under separate repayment allocation contracts, the CVP Water Customers and CVP Power Customers are responsible for repaying Defendant for the allocated proportional reimbursable costs of building, operating and maintaining the CVP (the "CVP Repayment Costs"). Because the CVP is primarily a *water* project, with most of its infrastructure – and its costs – associated with the storage and distribution of water for CVP Water Customers ("Water. It's about water."), CVP Water Customers are consequently responsible for more than three-quarters of the CVP Repayment Costs, reflecting water's predominant role within the CVP, while CVP Power Customers are responsible for less than a quarter of those costs.

8.     The core purposes of the CVPIA were to mitigate environmental impacts associated with the Central Valley Project, and foster restoration of affected fish and wildlife habitats within the CVP's sprawling watershed. One element of the CVPIA was the creation of a fund designated the "Restoration Fund," into which the users of CVP water and power would

4

contribute payments assessed by Reclamation to provide at least some of the funding for fish and wildlife restoration projects and activities within the CVP. When it established the Restoration Fund, Congress specifically mandated in Section 3407(d)(2)(A), 106 Stat. at 4727-28, that the payment obligations were to be assessed to the water and power users of the CVP *in proportion to their respective allocations for repayment of the Central Valley Project* (*i.e.*, their respective proportional shares of the CVP Repayment Costs).

9.     By requiring that the burdens of Restoration Fund payments be allocated in the same proportion as the overall CVP Repayment Costs obligations, Congress' "proportionality" mandate thus ensured fairness and balance in how Reclamation was to assess payments between CVP Water Customers and CVP Power Customers. Accordingly, CVP Water Customers, deriving the lion's share of the reimbursable *benefits* of the CVP and therefore responsible for repaying the lion's share of the CVP's reimbursable *costs*, would likewise be responsible for more than 75% of the Restoration Fund payments. CVP Power Customers such as Plaintiffs would, in turn, be responsible for *their* proportional share of the Restoration Fund payments, an obligation they understood would be part of a balanced federal, state and CVP user effort to address environmental issues associated with the CVP.

10.     The fair and balanced Restoration Fund payment system envisioned by Congress has not materialized, in part because Reclamation has systematically disregarded the statutory proportionality requirement and instead saddled Plaintiffs and other CVP Power Customers with grossly disproportionate Restoration Fund payment burdens. Reclamation, in effect, has turned the entire concept of proportionality on its head, forcing CVP Power Customers to pay an annual average of 40.5% of the total Restoration Fund payments from fiscal year 2008 to fiscal year 2013, rather than the approximately 22-24% that Congress designated as their "fair share,"

5

imposing a financial burden more than 50% higher than the Congressionally-mandated fair share attributable to CVP Power. In fiscal year 2014, it is estimated that CVP Power Customers could pay as much as 60% of the total Restoration Fund payment, and in fiscal year 2015, as high as 75% of the payment. When assessing Restoration Fund payments, Reclamation has ignored Congress' mandate and the predominant role of water in the CVP, and has essentially reformulated Mr. Stegner's sage observation into a new mantra for repayment of CVPIA mitigation and restoration costs: "Power. It's about power."

11.     Reclamation's unlawful interpretation and implementation of the CVPIA and its blatant disregard of the statutory "proportionality" limitation have forced CVP Power Customers to pay more than $120 million in excess charges. This is an action to recover those monies illegally exacted by Reclamation from Plaintiffs in contravention of the statute, and to attempt to restore some measure of the fairness and balance envisioned by Congress when it enacted the Restoration Fund.

## Parties

12.     NCPA is a California joint powers agency currently comprised of fifteen members, and having the capacity under the laws of the State of California to sue and be sued. Under the laws of the State of California, a joint powers agency is a public entity, created when two or more public entities join together to form a new, independent public entity to exercise powers common to its members. NCPA was originally established in 1968 as a forum through which community-owned utilities could prevent costly market abuses employed by private utilities at that time, and to make investments that would ensure an affordable, reliable, and clean supply of energy for electricity customers in its member communities. NCPA membership includes municipalities, a rural electric cooperative, and other publicly-owned entities interested

6

in the purchase, aggregation, scheduling, and management of electrical energy. By Contract No. 04-SNR-00782, dated December 13, 2004, Defendant, through Western, agreed to supply NCPA with CVP power, contingent upon designated NCPA members assigning their respective allocated share of CVP power to NCPA. Eleven of NCPA's members, which also contracted directly with Defendant, through Western, for an allocation of CVP power, timely assigned their respective contract allocation of CVP power, with Western's express written consent, to NCPA. Effective as of December 20, 2004, NCPA holds approximately 17.5% of the base allocation resource of CVP power. Since 2004, Western has allocated the Restoration Fund payment obligation, as established from time to time by Reclamation, on the basis of CVP power allocation. As a CVP Power Customer, NCPA is invoiced by Western, and NCPA has paid, on its behalf and that of those eleven members, the disproportionate and illegal assessment of excessive Restoration Fund payments at issue in this case. A copy of Western's June 2014 Restoration Fund Payment invoice to NCPA is attached as Exhibit 3.

13. Redding is a California municipal corporation, duly incorporated as a general law city pursuant to the laws of the State of California and having the capacity to sue and be sued. It is a city of approximately 90,000 residents nestled in the northern end of the Sacramento Valley. It contracts with Defendant, through Western, to receive an allocation of CVP power for Redding's municipal utility, to be used by Redding residents and businesses. As a CVP Power Customer, Redding is subject to, and has paid, the disproportionate and illegal assessment of excessive Restoration Fund payments at issue in this case.

14. Roseville is a California municipal corporation, duly incorporated and existing pursuant to a freeholder's charter as a charter city pursuant to the laws of the State of California and having the capacity to sue and be sued. It is a city of approximately 127,000 residents

located in Placer County along the eastern edge of the Sacramento Valley at the base of the Sierra Nevada foothills, approximately 16 miles from Sacramento. It contracts with Defendant, through Western, to receive CVP power for Roseville's municipal utility, to be used by Roseville residents and businesses. As a CVP Power Customer, Roseville is subject to, and has paid, the disproportionate and illegal assessment of excessive Restoration Fund payments at issue in this case.

15. Santa Clara is a California municipal corporation, duly incorporated and existing pursuant to a freeholder's charter as a charter city pursuant to the laws of the State of California and having the capacity to sue and be sued. It is a city of approximately 120,000 residents, is located approximately 45 miles south of San Francisco and situated at the center of Silicon Valley. Santa Clara contracts with Defendant, through Western, to receive CVP power for Santa Clara's municipal utility, called Silicon Valley Power, to be used by Santa Clara residents and businesses. As a CVP Power Customer, Santa Clara is subject to, and has paid, the disproportionate and illegal assessment of excessive Restoration Fund payments at issue in this case.

16. Each Plaintiff is the real party in interest with respect to the claim asserted herein by said Plaintiff for recovery of the excessive and disproportionate payments illegally exacted by Defendant. Each Plaintiff has the capacity and right to bring this suit under the laws of the State of California, and was assessed by and paid to Defendant the excessive and disproportionate payments illegally exacted by Defendant.

17. Defendant is the United States of America, acting through Reclamation and Interior, and for purposes of collection, Western, and their respective officers, employees and agents.

## Jurisdiction

18.     Jurisdiction is proper under 28 U.S.C. § 1491(a)(1), which gives this Court jurisdiction to render judgment on any claim against the United States founded upon the Constitution, any Act of Congress, regulation of an executive department, or express or implied contract with the United States.   This action is a claim against Defendant United States for monies illegally exacted under the provisions of the CVPIA, in contravention of Congress' mandate that payments by CVP Power Customers into the Restoration Fund created by the CVPIA must be proportional to their share of the repayment costs for the CVP.   The monies illegally exacted from Plaintiffs were paid directly to Defendant, through Western's Fund 843, which is specifically designated for receipt of CVPIA Restoration Fund payments, and transferred by Western to Reclamation's Unavailable Receipt Symbol account 145173.3 at the United States Treasury, an account titled as Central Valley Project (CVP) Restoration Fund.

## Additional Factual Allegations

### The Central Valley Project

19.     In 1933, the construction of the CVP was approved by the California legislature. To finance the CVP, California attempted to sell bonds – however, due in part to financial strains suffered during the Great Depression, California's attempt to sell these bonds was largely unsuccessful.   In pursuing a more reliable funding source for the CVP, California sought assistance from the federal government.

20.     In 1935, Congress authorized construction of the CVP through the Rivers and Harbors Act.   Congress reauthorized the Rivers and Harbors Act in 1937, and in doing so, it directed Reclamation to assume responsibility for the construction and operation of the CVP.

4831-8105-4009.1

Construction of the CVP was started in 1938, and its basic infrastructure was completed by the mid-1940s. Further construction and development of the CVP continued in subsequent years.

21.     Currently, the CVP is one of the largest water storage and conveyance systems in the United States, with approximately 20 dams and reservoirs, and 500 miles of major canals and aqueducts. Exhibit 1. Under the CVP, water ("CVP Water") is obtained from sources such as the Sacramento, Trinity, American, Stanislaus, and San Joaquin Rivers, and distributed to agricultural and municipal water users and wildlife refuges in various California localities, including the Sacramento and San Joaquin Valleys and the San Francisco Bay Area.

22.     While the CVP was constructed primarily to provide irrigation and transport water, an additional product of the CVP is the generation of electric power ("CVP Power"). Hydroelectric generators located in the CVP convert energy produced by flowing water into electric power, with a maximum operation capability of approximately 2,100 megawatts (MW) when all reservoirs are at their full capacity. There is no doubt, however, that power generation is but a tertiary by-product of the CVP's dams and reservoirs, as the Rivers and Harbors Act of 1937, which reauthorized the CVP and gave Reclamation responsibility for the CVP, expressly provides that the CVP's dams and reservoirs were to be used *first* for river regulation, navigation improvement and flood control, *second* for irrigation and domestic use, and *third*, for power. Pub. L. 75-392, 50 Stat. 844, 850 (1937)(emphases added). Moreover, CVP Power provided for commercial purposes, such as the CVP Power sold to Plaintiffs, is secondary to the CVP's own project power needs, such as the power needed for CVP's pumping and distribution of water. In other words, only CVP Power in excess of project use is offered for commercial sale to Plaintiffs and other CVP Power Customers.

4831-8105-4009.1

23.     Prior to 1977, Interior bore responsibility for marketing CVP Power – however, the Department of Energy Organization Act of 1977 transferred the CVP Power marketing functions to the Secretary of the Department of Energy, who delegated those functions in relevant part to Western. Since that time and continuing to the present date, Western has borne responsibility for marketing CVP Power to various entities, including municipalities and municipal agencies.   As acknowledged on Western's own website, its long-term firm power customers, such as Plaintiffs, must have preference status, as "various laws, including the *Reclamation Project Act of 1939*, require Western to give preference to certain types of nonprofit organizations seeking to purchase Federal power.   Those entitled to preference include cities and towns, state and federal agencies, irrigation districts, public utility districts and rural electric cooperatives."   (Emphasis in original).   Additionally, CVP Power Customers must be within CVP's marketing area, have a utility status, be ready and able to deliver power to their loads, and have an electric service contract with Western.  Plaintiffs meet those requirements.

24.     For many years, and most recently in 2004, NCPA and certain California municipalities or municipal agencies contracted with Western for the supply of CVP wholesale electric power for their respective municipal electric utilities, and fifteen of those municipalities or agencies are members of NCPA.   Under the 2004 Western power contracts, a power contractor receives an allocation of CVP-generated electric power, which is termed the power contractor's "Base Resource Allocation."

25.     In 2004, eleven NCPA members assigned their entire CVP Base Resource Allocation to NCPA.  The eleven NCPA members that have assigned their entire CVP Base Resource Allocation to NCPA are:  (1) City of Alameda (doing business as Alameda Power and Telecom and later as Alameda Municipal Power), (2) City of Biggs, (3) City of Gridley, (4) City

11

of Healdsburg, (5) City of Lodi, (6) City of Lompoc, (7) City of Palo Alto, (8) Plumas-Sierra Rural Electric Cooperative, (9) City of Oakland, acting by and through its Board of Port Commissioners as the Port of Oakland, (10) Truckee Donner Public Utility District, and (11) City of Ukiah. Western expressly consented to those Base Resource Allocation assignments in writing. Under this arrangement, Western considers NCPA to be, and NCPA acts as, the power contractor for those eleven NCPA members. NCPA receives from Western the invoices for the Base Resource Allocations for those eleven NCPA members that have assigned their Base Allocation Resource to NCPA, and NCPA pays such invoices to Western.

26. Two Plaintiffs, Redding and Santa Clara, have designated CVP Corporation, a California non-profit corporation, as their third-party agent for Restoration Fund payments to Western. Though CVP Corporation makes payments to Western on behalf of these two Plaintiffs, those two Plaintiffs have not assigned their Base Resource Allocation to CVP Corporation or any other entity, and thus remain directly liable for the Restoration Fund payments at issue in this case.

27. The remaining Plaintiff, Roseville, has maintained its direct contract with Western for electric power, retaining its respective Base Resource Allocation from Western, and makes Restoration Fund payments directly to Western.

## The Central Valley Project Improvement Act

28. On October 30, 1992, President George H. W. Bush signed into law the Reclamation Projects Authorization Adjustment Act of 1992, a forty-title omnibus water project bill, which included, as Title 34, the CVPIA. One purpose of the CVPIA was to modify the operations of the CVP by reassigning water away from valley farmers to environmental and wildlife uses, and by making it easier to transfer CVP Water to urban centers by allowing CVP

12

Water Customers to sell their water to willing buyers outside the CVP service area. The CVPIA directed Reclamation to undertake several specific "fish and wildlife restoration activities" and related programs designed to mitigate the environmental impacts of the CVP.

## The CVPIA's Establishment of the "Restoration Fund"

29.     Section 3407 of the CVPIA, 106 Stat. at 4726-28, established in the U.S. Treasury a fund named the "Central Valley Project Restoration Fund," commonly referred to as the "Restoration Fund." The CVPIA authorizes the appropriation of up to $50 million per year (as adjusted for inflation since October 1992) from the Restoration Fund to carry out programs, projects, plans, and habitat restoration, improvement, and acquisition provisions of the CVPIA. The Restoration Fund is but one of the possible sources of funding for CVPIA projects and activities. Funding for CVPIA projects and activities is also available through separate annual federal appropriations, such as (i) the Water and Related Resources appropriation, which is part of the Energy and Water Appropriations Act and funds a majority of Reclamation's activities, as well as (ii) the Resource Management Appropriation, which is part of the Department of the Interior Environment and Related Agencies Appropriation Act. Additional funding for CVPIA projects and activities is also available from the State of California, through cost-share agreements, state appropriations or non-Federal contributions.

30.     As created and authorized by the CVPIA, the Restoration Fund is to "be available for deposit of donations from any source and revenues provided under sections 3404(c)(3), 3405(f), 3406(c)(1), and 3407(d)" of the CVPIA. Thus, when adopting the CVPIA, Congress envisioned at least four separate provisions of the CVPIA as providing revenue streams for the Restoration Fund.

4831-8105-4009.1

31.     Section 3404(c) of the CVPIA requires Reclamation to impose additional mitigation and restoration charges in connection with renewal of certain long-term water contracts ("Pre-Renewal Charges"). Per Section 3407(a), those Pre-Renewal Charges are one of the revenue streams to be deposited into the Restoration Fund.

32.     Section 3405(f) addresses increased revenues realized by Reclamation as a result of water transfers and the water pricing reforms included in the CVPIA ("Transfer Revenues"). Per Section 3407(a), those Transfer Revenues are one of the revenue streams to be deposited into the Restoration Fund.

33.     Section 3406(c)(1) authorizes Reclamation to assess certain per acre-foot surcharges on CVP water delivered to entities receiving water from the Friant Division of the CVP ("Friant Surcharges"). Per Section 3407(a), those Friant Surcharges are one of the revenue streams to be deposited into the Restoration Fund.

34.     Section 3407(a) also expressly provides for the possibility of money being donated to the Restoration Fund by non-Federal entities ("Non-Federal Contributions"). Such Non-Federal Contributions would be another revenue stream for the Restoration Fund.

35.     After all of the other Restoration Fund revenue streams have been considered, the CVPIA provides for one final revenue stream, so-called "additional annual mitigation and restoration payments" ("Additional M&R Payments"). Section 3407(c)(1). These Section 3407(c) Additional M&R Payments are the charges at issue in this Amended Complaint. As contractors for CVP Water and CVP Power, CVP Water Customers and CVP Power Customers are subject to assessment of Additional M&R Payments. A number of other beneficial uses of CVP Water, including navigation, flood control, recreation, fish and wildlife enhancement, and water quality improvements, are not subject to the assessment of Additional M&R Payments for

the Restoration Fund. Those other beneficial uses of CVP Water are considered federal or state responsibilities.

36. Section 3407(c)(2) of the CVPIA generally provides that the Additional M&R Payments are to be established in amounts that – together with all of the other revenue streams available under sections of the CVPIA – would allow Reclamation to collect funds equal to those appropriated by Congress each year, up to the $50 million (adjusted for inflation since October 1992) authorization ceiling established by Section 3407(b) of the CVPIA. Congress, however, expressly circumscribed this general mandate by making it subject to a critical "safety valve" intended to protect both CVP Power Customers and CVP Water Customers from unfair and inequitable Additional M&R Payments. That "safety valve" is the statute's express directive that the assessment of Additional M&R Payments is "subject to the limitations" on such payments imposed by Section 3407(d).

37. In other words, the express terms of the CVPIA provide that Section 3407(d)'s "limitations" on Additional M&R Payments *take precedence over* Section 3407(c)(2)'s instructions to Reclamation regarding the total amount of Additional M&R Payments it should endeavor to collect in a given year.

38. Section 3407(d) of the CVPIA imposes five limitations on the amount of Additional M&R Payments that can be assessed by Reclamation. The first limitation is the imposition of an annual $30 million cap (adjusted for inflation since October 1992) on the total Additional M&R Payments that can be assessed against CVP Water Customers and CVP Power Customers. That $30 million cap is to be measured on a three-year rolling average basis, affording Reclamation some flexibility to recover more than $30 million in a given year, provided the three-year average does not exceed the $30 million cap.

4831-8105-4009.1

39.     Congress expressly designated the $30 million figure as the *ceiling* for the combined Additional M&R Payments collected from CVP Water Customers and CVP Power Customers, and not as a *floor*: "Provided, That such additional payments *shall not exceed* $30,000,000 (October 1992 price levels) on a three-year rolling average basis." Section 3407(d)(2)(A) (emphasis added). Thus, Congress recognized and intended that Reclamation's collection of Additional M&R Payments from CVP Water Customers and CVP Power Customers could total *less than* the $30 million annual ceiling, based on the other limitations on mitigation and restoration payments imposed by Section 3407(d). Indeed, by establishing an annual $30 million ceiling on Additional M&R Payments, Congress plainly contemplated that the various other revenue streams identified in the CVPIA – Pre-Renewal Charges, Transfer Charges, Friant Surcharges, Non-Federal Contributions – would account for at least $20 million of the $50 million maximum authorization.

40.     The second limitation imposed by Section 3407(d) on Reclamation's assessment of Additional M&R Payments is a "not to exceed" cap on the per acre-foot mitigation and restoration charges that can be assessed against CVP Water Customers. Section 3407(d) caps the Additional M&R Payments for CVP Water Customers at $6.00 per acre-foot (as adjusted for inflation since October 1992) for agricultural water sold and delivered by the CVP, and at $12.00 per acre-foot (as adjusted for inflation since October 1992) for municipal and industrial water sold and delivered by the CVP. Section 3407(d)(2)(A).

41.     The third limitation imposed by Section 3407(d) on Reclamation's assessment of Additional M&R Payments is a requirement that Reclamation reduce the Additional M&R Payments imposed on CVP agricultural water users as necessary to account for their probable ability to pay such charges.

4831-8105-4009.1

42.     The fourth limitation imposed by Section 3407(d) on Reclamation's assessment of Additional M&R Payments is a requirement to reduce the annual ceiling for Additional M&R Payments to $15 million (as adjusted for inflation since October 1992), upon the completion of the fish, wildlife and habitat mitigation and restoration actions identified in Section 3406 of the CVPIA. Though Reclamation has expended hundreds of millions of dollars to date on those Section 3406 projects, Reclamation claims that the projects are not yet completed and therefore has not yet reduced the Additional M&R Payment ceiling from $30 million to $15 million.

43.     The fifth limitation imposed by Section 3407(d) on Reclamation's assessment of Additional M&R Payments is the limitation that lies at the crux of this action: the proportionality limitation. Section 3407(d)(2)(A) of the CVPIA expressly states that "[t]he amount of the mitigation and restoration payment made by Central Valley Project water and power users, taking into account all funds collected under this title, *shall*, to the greatest degree practicable, be assessed in the same proportion, measured over a ten-year rolling average, as water and power users' respective allocations for repayment of the Central Valley Project." (Emphasis added.)

44.     The proportionality limitation requires Reclamation to ensure that the Restoration Fund payment obligation imposed on CVP Power Customers such as Plaintiffs is proportional to the CVP Power Customers' allocated share of the CVP Repayment Costs. In other words, the Additional M&R Payments imposed on CVP Power Customers such as Plaintiffs cannot, over a ten-year period, exceed the CVP Power Customers' proportional share of the obligation to repay CVP Repayment Costs.

45.     The import of the proportionality limitation can be illustrated using the respective proportional CVP Repayment Costs obligations for CVP Power Customers and CVP Water Customers. In fiscal year 2014, CVP Power Customers' proportional share of the CVP

17

Repayment Costs obligation, measured on a ten-year rolling average basis, is 24.215%. Accordingly, CVP Water Customers' proportional share of the CVP Repayment Costs obligation in fiscal year 2014, measured on that same ten-year rolling average basis, is 75.785%. Thus, pursuant to the proportionality limitation in Section 3407(d), CVP Power Customers' Additional M&R Payments should not have exceeded 24.215% of the *total* Restoration Fund payments collected by Reclamation during fiscal year 2014. Analyzed from the opposite perspective, the proportionality limitation dictates that the Restoration Fund payments by CVP Water Customers should have accounted for 75.785% of the total Restoration Fund collections in fiscal year 2014.

46.     Those percentages assume that Reclamation had faithfully adhered to the Section 3407(d) proportionality limitation throughout the preceding nine years, so that no further adjustment of the respective power and water payment obligations would be needed to render the fiscal year 2014 Restoration Fund payment obligations proportional on a ten-year rolling average basis. While the ten-year rolling average basis provides some flexibility to depart from a strictly proportional assessment of Restoration Fund payment obligations in a particular fiscal year, Section 3407(d) is clear that Reclamation is to ensure proportionality is maintained over the "long haul" of a ten-year period.

47.     Congress' intent that Section 3407(d)'s proportionality limitation would ensure an equitable balancing of the Restoration Fund payment burdens between CVP Water Customers and CVP Power Customers is reflected in statements made during the House of Representatives' debate on the Conference Report on the CVPIA in October of 1992:

> Section 3407(d) requires that contributions to the restoration fund be assessed to water and power users in the same proportions as their respective CVP repayment obligation, on a 10-year average basis. The intent of that provision is to allow for annual variations in the share of the $30 million that comes from water and power users but, over a 10-year rolling period, *to ensure that neither*

18

> *group contributes more than its proportional share of the project's*
> *repayment obligation.*

138 Cong. Rec. H11516 (daily ed. Oct. 5, 1992) (statement of Rep. Victor Fazio) (emphasis added).

48.     Unfortunately, Reclamation has disregarded the plain meaning of Section 3407(d)'s proportionality mandate, and the Congressional intent underlying it, by assessing Restoration Fund payment obligations on Plaintiffs grossly disproportionate to CVP Power Customers' share of the repayment obligations for the CVP as a whole.  Reclamation's refusal to give effect to Section 3407(d)'s proportionality limitation has forced Plaintiffs to file this Amended Complaint to attempt to restore the balanced and equitable approach Congress envisioned and, in fact, mandated.

### Reclamation's Assessment of Restoration Fund Payment Obligations for CVP Power and Water Customers: No Rules, No Regulations, No Reason

49.     Reclamation has not undertaken formal notice-and-comment rulemaking under the Administrative Procedure Act to implement the Restoration Fund provisions of the CVPIA. As a result, Reclamation has issued no regulations or formal rules governing its calculation and assessment of the respective Restoration Fund payment obligations for CVP Power Customers and CVP Water Customers.

50.     Reclamation uses Western as its agent to collect the Restoration Fund payment amounts Reclamation assesses against CVP Power Customers.   Western collects the Reclamation-established Restoration Fund payment amounts from Plaintiffs (and other CVP Power Customers) as an adjunct charge separate from the respective contractual power charges for CVP-generated power. *See* Exhibit 3.

4831-8105-4009.1

51.     In the absence of formal rules or regulations, Reclamation has informally explained its approach to calculating the Restoration Fund payments assessed to CVP Power Customers as follows.  Prior to the beginning of a new fiscal year, Reclamation prepares a projection of the revenues it can recover from CVP Water Customers under the CVPIA.  Certain of the potential revenue streams provided by the CVPIA – the Transfer Revenues and the Pre-Renewal Charges – have largely failed to materialize.  The Friant Surcharges have historically averaged approximately $7.5 million per year.  That leaves the Additional M&R Payments as the remaining revenue stream.  Reclamation projects the Additional M&R Payments it expects to receive from CVP Water Customers, based on the volume of projected water releases and the rate limitations imposed by Section 3407(d) on per-acre foot Additional M&R Payment charges to CVP Water Customers.

52.     After calculating the total Restoration Fund payments it expects to receive from CVP Water Customers, Reclamation *should* – according to the statute itself – apply Section 3407(d)'s proportionality limitation and determine what CVP Power Customers' proportional share of the Restoration Fund payment obligations would be in relation to the contribution by CVP Water Customers.  But that is *not* the approach Reclamation has taken.  Instead, what Reclamation does is to calculate the difference between the Additional M&R Payments it expects to extract from CVP Water Customers and the maximum $30 million (as adjusted for inflation since October 1992) ceiling on Additional M&R Payments – and then assesses that difference against CVP Power Customers *no matter how disproportionate that payment obligation is in relation to their share of the CVP Repayment Costs.*

53.     In other words, rather than working from the "bottom up" to calculate the maximum amount in Restoration Fund payments it can collect in a given fiscal year, applying all

Section 3407(d) limitations, Reclamation instead works from the "top down," determining at the outset that it will collect the full maximum payment ceiling authorized by the statute (regardless whether the otherwise applicable limitations in Section 3407(d) would allow it to reach that maximum ceiling), and then holding CVP Power Customers responsible for making up the difference between that payment ceiling and whatever CVP Water Customers can contribute.

54.     After establishing the Restoration Fund payment obligation it is imposing on CVP Power Customers for the upcoming fiscal year, Reclamation then directs Western to collect the Reclamation-determined amounts from the CVP Power Customers on Reclamation's behalf.

55.     Under Western's current procedures, Western allocates the Reclamation-determined Restoration Fund payment obligation among its CVP power contractors based on their respective Base Resource Allocation of CVP power, and advises Plaintiffs of their respective annual share of the CVP Power Customers' Restoration Fund payment obligation, and the monthly amounts to be collected from them in satisfaction of the Reclamation-assessed payment obligation. Western then submits monthly invoices to the CVP Power Customers seeking collection of the Reclamation-assessed Restoration Fund payment obligation. *See* Exhibit 3. Collectively, Plaintiffs' Base Resource allocations are approximately 40% of Western's total CVP Base Resource Allocations, so Plaintiffs' collective share of the cumulative overcharges has been approximately 40%.

56.     At about the mid-point of a fiscal year (generally in April), Reclamation determines whether it needs to make a mid-year adjustment to its initial calculation of the Restoration Fund payment obligation to reflect changes in the actual CVP hydrological experience during the fiscal year. If Reclamation *does* make a mid-year adjustment to the initial Restoration Fund payment obligation, Western proceeds to recalculate each CVP Power

Customer's annual share of the now-revised payment obligation, notifies each of them of the adjustment, and factors the adjustment into future invoices for the CVP Power Customer's Restoration Fund payment obligation. At the conclusion of the fiscal year, Reclamation undertakes a "true-up" process to reconcile the final Restoration Fund payments collected with the actual CVP water and power distributions during the fiscal year, to determine whether any retroactive adjustments to the CVP Power Customers' payment are required. Thus, Reclamation has the opportunity to make, and frequently *does* make, fine-tuned adjustments to the Restoration Fund payment obligations assessed to CVP Power Customers and CVP Water Customers during (and even after) a fiscal year.

### Reclamation's Unlawful Imposition of Additional M&R Payments Has Damaged Plaintiffs

57. Reclamation's method of calculating and assessing Restoration Fund payments owed by Plaintiffs and other CVP Power Customers thus turns the statute on its head. Rather than making the objective of collecting up to the $30 million ceiling for Additional M&R Payments subject to Section 3407(d)'s proportionality limitation, as the statute expressly provides, Reclamation has taken precisely the opposite approach, subordinating the statutorily mandated proportionality limitation of Section 3407(d) to Reclamation's overriding objective of "maxing out" the $30 million ceiling, without regard to how disproportionate a payment burden that represents for Plaintiffs and other CVP Power Customers.

58. Several years ago, Reclamation developed an analysis showing the 10-year rolling average Restoration Fund contribution percentages for CVP Water Customers and CVP Power Customers. Around 2011, CVP Power Customers asked Western to update the 10-year rolling average percentages and include an analysis of what the CVP Power Customers' Restoration Fund payments would have been if Reclamation had adhered to the statutory proportionality

22

requirement. Given Western's role as Reclamation's collection agent for CVP Power Customers' Restoration Fund payments, Western updated the historical assessment of Restoration Fund payments made by CVP Power Customers and CVP Water Customers. A copy of a Western-prepared spreadsheet reflecting the respective Restoration Fund payments imposed on CVP Power Customers and CVP Water Customers through fiscal year 2014 is attached hereto as Exhibit 4. The Western spreadsheet demonstrates that Plaintiffs and other CVP Power Customers have been overcharged by more than $120 million in excess Restoration Fund payments, including, according to the Exhibit 4, more than $90 million in just the last six fiscal years alone. Thus, Defendant itself openly acknowledges that it has disregarded Congress' proportionality mandate by tens of millions of dollars.

## COUNT I

### (Illegal Exaction)

59. Plaintiffs reallege and incorporate paragraphs 1-58 as if fully set forth herein.

60. An illegal exaction occurs where a "plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (citing *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967)) (internal quotation marks omitted); *Clapp v. United States*, 127 Cl. Ct. 505, 512, 117 F. Supp. 576, 580 (an illegal exaction occurs when "the Government has the citizen's money in its pocket").

61. Reclamation has assessed and extracted payments from Plaintiffs for the Restoration Fund established by the CVPIA, under the statutory authority provided by Section 3407 of the CVPIA. The statutory authority of Reclamation to extract Restoration Fund payments from Plaintiffs is subject to the limitations contained in Section 3407(d) of the CVPIA.

23

62.    Under Section 3407(d) of the CVPIA, Reclamation's authority to extract Restoration Fund payments from Plaintiffs and other CVP Power Customers is limited by the requirement that such payments "*shall*, to the greatest degree practicable, be assessed in the same proportion, measured over a ten-year rolling average, as water and power users' respective allocations for repayment of the Central Valley Project."

63.    Reclamation has disregarded the proportionality limitation imposed by Section 3407(d) of the CVPIA and, in so doing, has thereby exacted payments from Plaintiffs far in excess of their proportional share of the allocations for the CVP Repayment Costs. By imposing payment obligations on Plaintiffs and other CVP Power Customers in excess of their respective proportional share of the CVP Repayment Costs, and then collecting those excess funds from Plaintiffs, Reclamation has exceeded its statutory authority under the CVPIA to exact Restoration Fund payments from Plaintiffs, and has exacted said excessive payments without statutory authority.

64.    Because Defendant has exacted Restoration Fund payments from Plaintiffs in contravention of, and therefore in excess of, the proportionality limitation imposed by Section 3407(d) of the CVPIA, Defendant has illegally exacted monies from Plaintiffs without statutory authority and in contravention of the applicable federal statute.

65.    The illegally exacted monies were paid by Plaintiffs to Defendant and placed in Reclamation's Unavailable Receipt Symbol account 145173.3 at the United States Treasury, an account titled as Central Valley Project (CVP) Restoration Fund.

66.    Plaintiffs are entitled to a refund of the monies illegally exacted and held by Defendant in violation of the terms of the CVPIA, and specifically in violation of the proportionality limitation imposed by Section 3407(d) of the statute.

## COUNT II

**(Illegal Exaction: Failure To Take Practicable Steps Within Its Discretion to Reduce the Disproportionality of the Restoration Fund Payment Burden Imposed on Plaintiffs)**

67.     Plaintiffs reallege and incorporate paragraphs 1-66 as if fully set forth herein.

68.     As described in Paragraphs 51-53, Reclamation's method of calculating the annual Restoration Fund charges improperly converts the annual "shall not exceed" *ceiling* on Additional M&R Payments into a "shall be no less than" *floor*. Reclamation then compounds that misreading of the statute by adopting what can best be described as a "CVP Power pays the difference" policy. In other words, Reclamation imposes on CVP Power Customers the entire difference between (1) the statutory "shall not exceed" maximum authorized amount of Additional M&R Payments in a given year and (2) the amount of Additional M&R Payments actually collected from CVP Water Customers in that year, completely without regard to application of the proportionality limitation of Section 3407(d). Consequently, from the very inception of CVPIA, continuously to the present time, Reclamation has determined and assessed the annual Additional M&R Payments exacted from CVP Power Customers entirely without consideration of the proportionality limitation of Section 3407(d).

69.     Given that its method of assessing and collecting Additional M&R Payments as described in Paragraphs 51-53 and summarized in Paragraph 68 completely ignores the proportionality of the payment burden imposed on CVP Power Customers, and given that Reclamation's own voluntary policy decisions (as described below), environmental opinions, and drought conditions have severely curtailed collections of Restoration Fund payments from CVP water users, Reclamation's "CVP Power pays the difference" policy has had the predictable result of exacting grossly disproportionate Restoration Fund payments from Plaintiffs and other CVP Power Customers. For example, in Fiscal Year 2016, Reclamation has determined

25

$49,528,000 to be the statutory ceiling on Additional M&R Payments and has designated that amount as the mandatory minimum amount of Additional M&R Payments required to be collected, regardless of how little of that amount will be contributed by CVP Water Customers. Reclamation has projected that CVP Water Customers will contribute only $7,995.099 in Fiscal Year 2016 Additional M&R Payments. Rather than using the amounts collectible from CVP Water Customers as the basis for determining the proportional contribution of CVP Power Customers—as Section 3407(d) expressly contemplates and requires—Reclamation has instead assessed to, and collected from, CVP Power Customers *$41,532,901*. CVP Power Customers' proportional share of the CVP repayment costs is in the range of 23% to 25%, yet Reclamation has assessed them with, and collected from them, approximately 84% of the Additional M&R Payments collected in Fiscal Year 2016. Other years covered by the Amended Complaint have been comparably disproportionate as to CVP Power Customers' Restoration Fund payments.

70. Reclamation's practice of treating the maximum annual "shall not exceed" statutory *ceiling* on Additional M&R Payment as a "not less than" mandatory minimum *floor* for Additional M&R Payments to be collected in a particular year, combined with Reclamation's "CVP Power pays the difference" policy and its disregard of the proportionality limitation of Section 3407(d), as summarized in Paragraphs 68 and 69, has resulted in disproportionate assessments of Additional M&R Payments to CVP Power Customers in those years in which the Restoration Fund payments by CVP Water Customers fall below the CVP Water Customers' respective CVP repayment allocation. Reclamation's failure to adjust for those disproportionate results, when measured and considered in Section 3407(d)'s ten-year rolling average calculation, violated the CVPIA and represents an illegal exaction from Plaintiffs and other CVP Power

Customers in excess of the limited statutory authority conferred on Reclamation by Section 3407(d) of the CVPIA.

71.    Reclamation's approach of converting the CVPIA's annual "shall not exceed" ceiling on Additional M&R Payments into a "shall be no less than" floor, so as to automatically collect the statutory maximum amount of Additional M&R Payments every year, summarized in Paragraphs 68, 69 and 70, violates the terms of the CVPIA and is therefore unlawful in its own right.    Yet, even *were* that approach somehow found to be permissible under the CVPIA, Defendant's collection and assessment of those Additional M&R Payments would nonetheless still be subject to the proportionality limitation of Section 3407(d).    In other words, even if Defendant could lawfully interpret the statute so as automatically to impose and mandate collection of the full statutory "shall not exceed" ceiling amount of Additional M&R Payments every year, Defendant's authority to do so would at all times nonetheless remain subject to Defendant's concomitant statutory duty under Section 3407(d) to ensure that the total Restoration Fund payment burden imposed on CVP Water Customers and CVP Power Customers "shall, *to the greatest degree practicable,* be assessed in the same proportion, measured over a ten-year rolling average, as water and power users' respective allocations for repayment of the CVP."

72.    Indeed, if anything, Reclamation's policy of holding CVP Power Customers financially responsible in each year for the difference between the Additional M&R Payments actually received from CVP Water Customers and the statutory maximum "shall not exceed" ceiling on Additional M&R Payments (the "CVP Power pays the difference" policy) made (and makes) it all the more imperative that Reclamation take every practicable step to bring payments

4831-8105-4009.1

from CVP Water Customers as close as practicable to their proportional CVP repayment allocation.

73.     Yet, Reclamation has done exactly the opposite, despite acknowledging that its Restoration Fund payment assessment policies have resulted in disproportionate payment burdens imposed on CVP Power Customers (including Plaintiffs) during the entire time period at issue in this litigation. In short, Reclamation has, on the one hand, interpreted the statute and appropriations laws as to require imposition and collection of the full statutory "shall not exceed" ceiling amount of Additional M&R Payments every year, while on the other hand, altogether ignoring the express, statutorily mandated proportionality limitation when exercising its discretion in the assessment and collection of Restoration Fund payments. In fact, as set forth below, Reclamation repeatedly exercised its discretion over the assessment and collection of Restoration Fund payments in a manner that has had the effect of *exacerbating*, rather than *mitigating*, the disproportionality of that burden on CVP Power Customers.

74.     For example, in a particularly breathtaking acknowledgment of its failure to apply its statutory obligations to ensure proportionality "to the greatest degree practicable," Reclamation has acknowledged that it has—for *years*, if not *decades*—failed to monitor or enforce the actual collection of Restoration Fund payments charged to CVP Water Customers. Unlike Western, which collects the full amount of Restoration Fund payments assessed against CVP Power Customers every year with mechanical precision, Reclamation has, since the inception of the CVPIA, apparently failed to monitor or enforce the payment of Restoration Fund charges by CVP Water Customers. Instead, Reclamation's lack of oversight allowed over 100 CVP Water Customers to accrue "abnormal balances" in their accounts with Reclamation, reflecting in the aggregate *millions* of dollars in unpaid Restoration Fund payment obligations

28

tracing back as far as the beginning of the Restoration Fund itself in 1993. Reclamation has acknowledged that it will not be able to collect some of these unpaid obligations due to their age, as some are beyond the statute of limitations. Reclamation has also not imposed or collected late fees for these delinquent payments by CVP Water Customers, as would be necessary to reflect the time-value of money and to remove the strong financial incentive for CVP Water Customers to ignore their payment obligations in the year imposed.

75.     The consequence of the failure by Reclamation to perform a basic duty under the CVPIA—*i.e.*, to ensure its own CVP water contractors *actually pay* the Restoration Fund charges they are assessed—has had a direct and prejudicial impact on Plaintiffs. Reclamation simply shifted the financial burden for the Restoration Fund payment amounts that were uncollected— some now forever *uncollectable—from* CVP Water Customers *to* CVP Power Customers (including Plaintiffs) under its "CVP Power pays the difference" policy. In short, when CVP Water Customers did not pay assessed Restoration Fund charges, Reclamation made up for those non-payments by simply charging the CVP *Water* Customers' unpaid amounts to CVP *Power* Customers—and, of course, utterly without regard to the proportionality limitation of Section 3407(d).

76.     It is and has at all times been eminently "practicable" for Reclamation to monitor and enforce the actual and timely payment of Restoration Fund charges assessed to CVP Water Customers, which, after all, are in direct privity of contract with Reclamation, and with which Reclamation deals directly and regularly. Reclamation's inexplicable failure to monitor or enforce actual and timely payment of Restoration Fund charges by CVP Water Customers (including through the assessment and collection of appropriate late fees and penalties) and its decision instead to shift the financial burden for those uncollected charges to CVP Power

Customers constitutes an illegal exaction from Plaintiffs contrary to the proportionality requirement of Section 3407(d).

77. When the Restoration Fund burden on CVP Power Customers would otherwise exceed their proportional CVP repayment obligation—as it has by *millions of dollars* for each of the years at issue in this Amended Complaint—Section 3407(d) *requires* Reclamation to exercise its discretion "to the greatest degree practicable" to try to reduce CVP Power Customers' payment burden as close as practicable to that proportional level. Reclamation has violated that statutory obligation by failing to exercise its discretion to take eminently practicable steps that would have increased the Restoration Fund payments assessed to and collected from CVP Water Customers and other beneficiaries of the CVP aside from CVP Power Customers, thereby reducing the Restoration Fund payment burden on CVP Power Customers to a level equaling— or at the very least, approaching as closely as possible—CVP Power Customers' CVP repayment obligation.

78. Numerous voluntary Reclamation policy decisions, not required by the CVPIA or any other statute and that have never been formalized in duly-adopted rules or regulations, have had the direct effect of exacerbating the disproportionate Restoration Fund payment burden imposed by Defendant on Plaintiffs and other CVP Power Customers:

a. Reclamation's voluntary decision to adopt a highly restrictive definition of the types of CVP water transactions subject to Restoration Fund charges, thereby excluding entire broad categories of water transactions by CVP Water Customers from contribution toward the Restoration Fund, even though the excluded water transactions involve CVP infrastructure and facilities (including use of CVP Power to operate pumping stations), and have an

30

environmental impact indistinguishable from other types of water transactions to which Reclamation *does* assess Restoration Fund charges. Reclamation's restrictive definition of the types of CVP water transactions subject to Restoration Fund charges is neither required by, nor supported by, the language of the CVPIA itself, and it has the direct impact of minimizing Restoration Fund collections from CVP Water Customers and concomitantly maximizing the charges imposed and collected on CVP Power Customers under Reclamation's "CVP Power pays the difference" policy.

b.  Reclamation's voluntary decision to adopt the Consumer Price Index for All Urban Consumers ("CPI-U"), rather than the Gross Domestic Product Deflator ("GDP Deflator"), as the index by which it would inflate the Restoration Fund figures from October 1992 levels. Both the CPI-U index and the GDP Deflator are used by federal agencies as inflation indices for budgeting purposes, and Reclamation has acknowledged that using the CPI-U produces higher inflation-adjusted figures than the GDP Deflator. Reclamation's voluntary decision to use the CPI-U to escalate the CVPIA's October 1992 dollar figures served to raise the statutory $30 million cap on annual Additional M&R Payments—which, as discussed above, Reclamation improperly treats as a "floor" rather than a "ceiling"—substantially higher than would be the case using the GDP Deflator, and resulted in payment burdens on CVP Power Users in recent years several million dollars a year more than would have been imposed had Reclamation made the voluntary decision to use the GDP Deflator instead. Western, Reclamation's sister

agency, has long advocated that Reclamation use the GDP Deflator as the inflation index for the Restoration Fund, but Reclamation has refused to change its own, purely voluntary decision to use the higher inflation index, even though that voluntary decision dramatically exacerbated the disproportionate payment burden on CVP Power Users.

c.  Reclamation's voluntary decision not to impose Restoration Fund charges on many other "direct beneficiaries of the CVP," as specified in Section 3407(c)(1), such as recreational users of CVP water resources or Reclamation's concession contractors, persons and entities that directly benefit from the CVP and the ability to charge visitors to, or recreational users of, CVP water resources. "Recreation" has been designated by statute as one of the specific project purposes of the CVP, yet Reclamation has made the voluntary decision to exempt that authorized project purpose from contribution toward its fair share of the environmental mitigation costs of the CVP reflected in the Restoration Fund. There are numerous "practicable" ways in which Reclamation could assess and collect some Restoration Fund charge for recreational use of the CVP, including through assessing a Restoration Fund surcharge on fees for: (i) boating or fishing in CVP waters (including marina or dock fees); (ii) camping or hiking in recreation areas adjacent to CVP waters/facilities; or (iii) concession transactions in recreation areas adjacent to CVP waters/facilities. Were it not for Reclamation's voluntary decision to forego assessment of Restoration Fund charges it could practicably collect from CVP recreational users or concessionaires, Plaintiffs'

Restoration Fund payment burden would have been reduced to a level more closely approximating their CVP repayment obligation.

79.    Each of the above voluntary, discretionary decisions by Reclamation, and any other instances in which Reclamation failed to exercise its discretion in a manner that would have reduced the disproportionate Restoration Fund payment burden on CVP Power Customers, constitutes a failure by Defendant to implement and/or enforce the proportionality limitation imposed by Section 3407(d) of the CVPIA. These discretionary actions—or discretionary *failures* to act—by Reclamation have therefore resulted in Defendant exacting payments from Plaintiffs far in excess of their proportional share of the allocations for the CVP Repayment Costs.

80.    By imposing payment obligations on Plaintiffs and other CVP Power Customers in excess of their respective proportional share of the CVP Repayment Costs, and then collecting those excess funds from Plaintiffs, Defendant has exceeded its statutory authority under the CVPIA to exact Restoration Fund payments from Plaintiffs, and has exacted said excessive payments without statutory authority.

81.    Because Defendant has exacted Restoration Fund payments from Plaintiffs in contravention of, and therefore in excess of, the proportionality limitation imposed by Section 3407(d) of the CVPIA, Defendant has illegally exacted monies from Plaintiffs without statutory authority and in contravention of the applicable federal statute.

82.    The illegally exacted monies were paid by Plaintiffs to Defendant and placed in Reclamation's Unavailable Receipt Symbol account 145173.3 at the United States Treasury, an account titled as Central Valley Project (CVP) Restoration Fund.

4831-8105-4009.1

83. Plaintiffs are entitled to a refund of the monies illegally exacted and held by Defendant in violation of the terms of the CVPIA, and specifically in violation of the proportionality limitation imposed by Section 3407(d) of the statute.

## Prayer For Relief

WHEREFORE, each Plaintiff requests that this Court enter judgment against Defendant, United States, acting through its Department of the Interior and its Bureau of Reclamation, as follows:

(a) Awarding each Plaintiff damages equal to the Restoration Fund overpayments illegally exacted by Defendant as a result of Reclamation's violation of the proportionality limitation imposed on such payments by Section 3407(d) of the CVPIA, plus costs and such additional damages as necessary to make them whole as provided by law and as determined at trial;

(b) Awarding each Plaintiff costs and fees pursuant to 28 U.S. C. § 2412; and

(c) Awarding each Plaintiff such other relief as this Court deems just and equitable.

Dated: September 27, 2016

Respectfully submitted,

David T. Ralston, Jr.
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5143
Telephone 202.295.4097
Facsimile 202.672.5399
Email dralston@foley.com
*Attorney of Record for Plaintiffs*

4831-8105-4009.1

Jay N. Varon
Frank S. Murray
Anna S. Ross
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5143

Michael F. Dean, Esq.
General Counsel
Northern California Power Agency
MEYERS NAVE
555 Capitol Mall, Suite 1200
Sacramento, CA 95814

Barry E. DeWalt, Esq.
Assistant City Attorney
City of Redding
777 Cypress Avenue 96001
PO Box 496071
Redding, CA 96049-6071

Robert R. Schmitt, Esq.
City Attorney
City of Roseville
311 Vernon Street
Roseville, CA 95678

Richard E. Nosky, Jr., Esq.
City Attorney
City of Santa Clara
1500 Warburton Avenue
Santa Clara, CA 95050

*Of Counsel to Plaintiffs*

4831-8105-4009.1

# EXHIBIT 1

**Map of the Central Valley Project
(from Bureau of Reclamation website)**



CENTRAL VALLEY PROJECT

Central Valley Project
Service Areas

# EXHIBIT 2

**Bureau of Reclamation
Mid-Pacific Region
Webpage for Central Valley Project**

**http://www.usbr.gov/mp/cvp/index.html**

**(Screen Shot Taken on September 4, 2014)**

U.S. Department of the Interior | Bureau of Reclamation          Contact Us | MP Site Index





# RECLAMATION
**Mid-Pacific Region**          *Managing Water in the West*

Reclamation Home          Reclamation Offices          Newsroom          Library          Projects & Facilities

**Search Reclamation**

»

**Central Valley Project Information**

About the CVP
News & Events
Water Info Links

Ratesetting
Financial Information
Projects/Activities
Laws/Regs/Links
CVPIA Homepage

MP Region Home Page
Public Affairs
Area Offices
About Us
Programs & Activities
Water Operations
Central Valley Project
CVP Improvement Act
Environmental Documents (NEPA)



**U.S. Department of the Interior**

## The Central Valley Project

When asked what a newcomer should know about California, noted western writer Wallace Stegner answered with four words: *"Water. It's about water."*

- Early settlers were attracted to California's mild climate, abundant natural resources, and scenic beauty. The only thing that seemed to be missing was a reliable water supply; the State's arid conditions and unreliable precipitation made it difficult for farmers to grow crops. By the turn of the 20th century, it was evident California not only needed a special system for water storage and delivery, but also for protection from periodic floods.

- The Central Valley Project (CVP) was originally conceived as a State project to protect the Central Valley from crippling water shortages and devastating floods. The basic concept and facilities of today's massive project were included in the State Water Project formulated in the 1930's. In the depression era, however, the State was unable to finance the project. Most of the water development envisioned by the State was accomplished by the Federal CVP, beginning with its initial authorization in 1935.

- Work began in 1937 with the Contra Costa Canal which began delivering water in 1940. The next facility built was Shasta Dam, the keystone of the project. Work on the dam began in 1938, and water storage started even before its completion in 1945. Congress subsequently passed 13 separate measures to authorize the development of other major project facilities over the next 3 decades. The final dam, New Melones, was completed in 1979. More...

Water Supply and Yield Study - March 2008

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader.

For additional information about the various portions of the CVP,
See our contact listing

January 3, 2014

Back

Privacy Policy | Disclaimer | Accessibility | FOIA | Quality of Information | FAQ | Notices
DOI | Recreation.gov | USA.gov
Stay in touch with Reclamation: Facebook | Twitter | YouTube | Flickr | Tumblr | Pinterest | Instagram | RSS | Multimedia

# EXHIBIT 3

**Western Area Power Administration Monthly Invoice to NCPA for Restoration Fund Payments**

**(June 2014)**

# United States Department Of Energy



### Sierra Nevada Region
### Wholesale Power Bill
### June 2014 Service Month
### Restoration Bill

Tax Id:       840743678
Northern California Power Agency, ID: 29
Accounting Department
651 Commerce Drive
Roseville, CA 95678-6420

| | |
|---|---|
| Due Date: | 15 Jul 2014 |
| Issue Date: | 25 Jun 2014 |
| Invoice No.: | NNPB00091-0614R |
| Vendor Number: | 1418 |
| NAICS Code: | 221100 |
| County Code: | 34 |

| Contract Number: 68 FR 18621 |
|---|

| Item | Description of Charges/Credits | KW | KWH | Unit Cost | Dollars |
|---|---|---|---|---|---|
| 1 | RESTORATION FUND CHARGE @ 17.53465% | | | | $882,383.87 |
| | **Sub Totals:** | | | | $882,383.87 |

| Amount due this bill: | $882,383.87 |
|---|---|

| Payment through ACH: | Payment through EFT: | Remittance Check Payable To: |
|---|---|---|
| Richmond Federal Reserve Bank | Federal Reserve Bank - New York | Western Area Power Administration |
| P.O. Box 27622 | To: ▇▇▇▇▇▇ | File # 4185 |
| Richmond, VA 23261 | ▇▇▇▇▇▇ | P.O. Box 301509 |
| ▇▇▇▇▇▇ | | Los Angeles, CA 90030-1509 |

Notes:    1. **RETURN REMITTANCE COPY OR REFERENCE BILLING INFORMATION ON ACH PAYMENTS**
          2. Your cancelled check is your receipt
          3. All accounts not paid by due date are subject to late charges

SNR Contact:      Amanda Fowler          916-353-4532          fowler@wapa.gov

**United States Department Of Energy**



Sierra Nevada Region
Wholesale Power Bill Detail
June 2014 Service Month
Restoration Bill

Tax Id:        840743678

Northern California Power Agency, ID: 29

Accounting Department

651 Commerce Drive

Roseville, CA 95678-6420

**Due Date:**      15 Jul 2014

Issue Date:    25 Jun 2014

Invoice No.:   NNPB00091-0614R

Vendor Number: 1418

NAICS Code:    221100

County Code:   34

| Item | Description of Charges/Credits | Dollars |
|------|-------------------------------|---------|
| 1 | RESTORATION FUND CHARGE @ 17.53465% | $882,383.87 |

Account: NCV843000040004596005NRVTR7200

Sub Totals:                                    $882,383.87

**Amount due this bill:**                            **$882,383.87**

# EXHIBIT 4

**May 2014 Spreadsheet Prepared by
Western Area Power Administration
Titled
"Historic and Annual CVPIA
Restoration Fund Collections and
Percentage Comparisons for the
Power Function"**

## Historic and Annual CVPIA Restoration Fund Collections and Percentage Comparisons for the Power Function [1]

| Year | 3407(d)[2][A] | CVPIA 3407 Actual Collections Water, Power and Other | | | | CVPIA Annual Percentage | CVP 10-Year Percentage | Power's Cap as a Percentage of Collections | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Actual Restoration Fund Collections from Water and Power | Power | Water | Other | Total | Power Collections as a Percent of CVPIA Fund Collections from Water, Power & Others | Power's 10-Year Rolling Average Capital CVP Percentages [2][3] | Power's Maximum Repayment Obligation Derived After Water and Other Collections | Power's CVPIA Annual Percentage | Power Derived Over/(Under) Payment |
| 1993 | $0 | $0 | $0 | $8,771,053 | $8,771,053 | 0.000% | ------------ | ------------ | | |
| 1994 | $18,692,262 | $5,472,398 | $13,219,864 | $2,288,281 | $20,980,543 | 26.083% | 21.302% | $4,197,750 | 21.302% | $1,274,648 |
| 1995 | $28,844,920 | $10,582,808 | $18,262,112 | $4,717,141 | $33,562,061 | 31.532% | 21.302% | $6,220,032 | 21.302% | $4,362,776 |
| 1996 | $38,174,144 | $8,328,838 | $29,845,306 | $8,650,884 | $46,825,028 | 17.787% | 21.302% | $10,420,161 | 21.302% | ($2,091,323) |
| 1997 | $30,594,103 | $1,945,430 | $28,648,673 | $6,077,859 | $36,671,962 | 5.305% | 21.302% | $9,399,789 | 21.302% | ($7,454,359) |
| 1998 | $20,897,053 | $4,845,695 | $16,051,358 | $3,734,592 | $24,631,645 | 19.673% | 21.302% | $5,355,667 | 21.302% | ($509,972) |
| 1999 | $40,981,000 | $10,911,746 | $30,069,254 | $7,719,852 | $48,700,853 | 22.406% | 21.302% | $10,228,768 | 21.302% | $682,978 |
| 2000 | $37,098,728 | $11,989,179 | $25,109,549 | $9,896,250 | $46,994,978 | 25.512% | 21.302% | $9,475,381 | 21.302% | $2,513,798 |
| 2001 | $28,584,211 | $6,891,001 | $21,693,209 | $7,526,334 | $36,110,545 | 19.083% | 21.302% | $7,909,155 | 21.302% | ($1,018,154) |
| 2002 | $44,401,642 | $20,556,612 | $23,845,030 | $7,348,476 | $51,750,118 | 39.723% | 21.302% | $8,443,468 | 21.302% | $12,113,144 |
| 2003 | $40,076,134 | $15,809,615 | $24,266,518 | $7,788,268 | $47,864,401 | 33.030% | 21.302% | $8,676,600 | 21.302% | $7,133,015 |
| 2004 | $30,774,000 | $4,181,758 | $26,592,242 | $7,507,814 | $38,281,814 | 10.924% | 21.573% | $9,379,939 | 21.573% | ($5,198,181) |
| 2005 | $46,336,000 | $18,963,247 | $27,372,753 | $11,239,099 | $57,575,099 | 32.937% | 21.786% | $10,755,080 | 21.786% | $8,208,167 |
| 2006 | $43,918,000 | $13,488,271 | $30,429,729 | $10,953,565 | $54,871,565 | 24.582% | 21.924% | $11,620,566 | 21.924% | $1,867,704 |
| 2007 | $32,862,000 | $5,366,834 | $27,495,166 | $7,220,078 | $40,082,078 | 13.390% | 22.088% | $9,841,749 | 22.088% | ($4,474,915) |
| 2008 | $46,913,864 | $27,011,088 | $19,902,777 | $6,012,735 | $52,926,599 | 51.035% | 22.324% | $7,448,090 | 22.324% | $19,562,997 |
| 2009 | $52,685,000 | $34,536,089 | $18,148,911 | $6,731,823 | $59,416,823 | 58.125% | 22.623% | $7,274,472 | 22.623% | $27,261,617 |
| 2010 | $36,836,789 | $10,681,594 | $26,155,195 | $11,132,008 | $47,968,797 | 22.268% | 23.000% | $11,137,736 | 23.000% | ($456,142) |
| 2011 | $49,614,000 | $20,960,452 | $28,653,548 | $9,582,862 | $59,196,862 | 35.408% | 23.630% | $11,830,907 | 23.630% | $9,129,545 |
| 2012 | $52,767,000 | $20,862,633 | $31,898,066 | $6,740,140 | $59,500,839 | 35.063% | 24.215% | $12,345,770 | 24.215% | $8,516,863 |
| 2013 | $39,188,227 | $17,404,274 | $21,783,953 | $6,740,140 | $45,928,367 | 37.894% | 24.215% | $9,114,085 | 24.215% | $8,290,189 |
| Total | $760,239,076 | $270,789,562 | $489,443,214 | $158,379,254 | $918,612,030 | | | $183,449,317 | | $87,340,245 |
| 2014 Revised | $53,347,000 | $44,703,462 | $8,643,538 | $3,000,000 | $56,347,000 | 79.336% | 24.215% | $3,720,370 | 24.215% | $40,983,092 |
| 2014 Initial | $53,347,000 | $20,568,247 | $32,778,753 | $8,000,000 | $61,347,000 | 33.528% | 24.215% | $13,029,722 | 24.215% | $7,538,525 |
| DIFFERENCE | | | | | | | | | | |

$128,323,337

[1] Source: SMUD/NCPA Power Alternatives Presentation dated May 10, 2010.
[2] Based on CVP power capital costs, rolling 10-year capital percentages.
[3] 10-Year rolling data for 1993-2002 not available, assumed 10-Year rolling average for 1994-2003