# In the United States Court of Federal Claims

No. 14-817C

(Filed: July 30, 2018)

```
*************************************
                                    *
NORTHERN CALIFORNIA POWER           *
AGENCY, et al.,                     *
                                    *
                    Plaintiffs,     *    Illegal Exaction Claim; Department of
                                    *    Interior, Bureau of Reclamation; Central
v.                                  *    Valley Project Improvement Act; Statutory
                                    *    Authority; Statutory Interpretation; Plain
THE UNITED STATES,                  *    Meaning.
                                    *
                    Defendant.      *
                                    *
*************************************
```

*David T. Ralston, Jr.*, with whom were *Frank S. Murray, Krista Nunez,* and *Jay N. Varon*, Foley & Lardner LLP, Washington, D.C., *Jane Luckhardt*, General Counsel, Northern California Power Agency, Roseville, California, *Robert R. Schmitt*, City Attorney, City of Roseville, *Barry E. DeWalt*, City Attorney, City of Redding, and *Brian Doyle*, City Attorney, City of Santa Clara, for Plaintiffs.

*P. Davis Oliver*, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Franklin E. White, Jr.*, Assistant Director, *Sosun Bae*, *Ashley Akers*, and *Alex Haas*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Plaintiffs Northern California Power Agency ("NCPA"),[1] and the cities of Redding, Roseville, and Santa Clara, California seek recovery of payments that they claim were unlawfully assessed and collected by the Department of Interior, Bureau of Reclamation

---

[1] NCPA is a joint powers agency in California comprised of sixteen members including "municipalities, a rural electric cooperative, and other publicly-owned entities interested in the purchase, aggregation, scheduling, and management of electrical energy." Stip. ¶ 3.

under section 3407(d) of the Central Valley Project Improvement Act ("CVPIA"), Pub. L. 102-575, 106 Stat. 4600, 4706–4731.  In their illegal exaction claim, Plaintiffs argue that the Bureau of Reclamation has ignored the "proportionality" provision in section 3407(d) of the CVPIA and instead has followed a revenue-maximizing payment scheme that unlawfully assesses disproportionate payments on Plaintiffs to fund fish and wildlife habitat restoration projects within the Central Valley.  In response, the Government contends that the proportionality provision is not a mandatory limitation on its maximum fund collection and that achieving proportionality has not been practicable.

The calculation of payments due under the CVPIA from water and power customers is complicated and somewhat perplexing.  In years when California has experienced severe droughts, the payment structure under the CVPIA has resulted in power customers bearing a disproportionately high assessment of payments, because the water customers' share of payments is much lower.  In effect, water customers' payments are based upon actual annual usage (lower in drought years), and power customers make up the difference to reach an annual monetary objective.  This payment system created by Congress is curious in the extreme, but if the system is to be fixed, it should be addressed by Congress.  It is not the province of the judiciary to improve the perceived fairness of a statute.  The question presented is whether the Bureau of Reclamation has followed the mandate in the statute.

For the reasons explained below, the Court finds that the Bureau of Reclamation essentially has followed the payment scheme created by Congress, and that the disparity between water and power customers' payments has occurred most notably in years of severe California droughts.  Disproportionate payments caused by droughts do not constitute illegal exactions under the Fifth Amendment.  Simply stated, the Bureau of Reclamation has not done anything illegal.  Accordingly, Plaintiffs' amended complaint is DISMISSED.

### Background[2]

### A.  History of the Central Valley Project and CVPIA

In 1935, Congress created the Central Valley Project to supply water to California farms and communities for agricultural, municipal and industrial uses due to California's scarce water resources.  Am. Compl. at ¶¶ 1–2, 4.  The Central Valley's need for water is significant – it supplies eight percent of the United States' total agricultural output and one-

---

[2] The Court refers to the trial transcript by witness and page as "Name, Tr. __" and to joint trial exhibits as "JX __."  The parties' stipulations of fact, filed on December 29, 2017, are referred to as "Stip. ¶ __."  The pleadings referenced are Plaintiffs' amended complaint and the parties' post-trial briefs.

quarter of the nation's food – but annual rainfall does not provide a reliable source of water for Central Valley farmers.  Id. at ¶ 3.  Today, the Central Valley Project is a "network of dams, reservoirs, canals and aqueducts" and is one of the nation's largest federal reclamation projects, stretching the length of California's Central Valley, from the Cascade Range in the north, to the Kern River in the south.  Id. at ¶ 1.

The Bureau of Reclamation ("Reclamation") of the United States Department of Interior manages the Central Valley Project and oversees approximately nine million acre-feet of water annually.  Id. at ¶ 4.  An acre-foot is approximately 326,000 gallons of water.  Id.  Each year, the Central Valley Project delivers five million acre-feet of water for agricultural purposes.  Id. at ¶ 5.  Another 600,000 acre-feet of water are furnished for municipal and industrial purposes and another 1.2 million acre-feet of water are dedicated to mitigation and restoration purposes such as fish, wildlife, refuges and wetlands.  Id.  Central Valley water districts and farmers, California municipalities, and other water users ("CVP Water Customers") pay Reclamation for the water they receive.  Id.

The delivery of much needed water to farms, businesses and residents is not the only benefit from the Central Valley Project.  The dams built as part of the Central Valley Project allow the production of hydroelectric power.  Am. Compl. at ¶ 6.  Reclamation, acting through the Department of Energy Western Area Power Administration ("Western"), sells the hydroelectric power created from the Central Valley Project.  Id.  Plaintiffs, among others ("CVP Power Customers"), contract with Western to receive the electric power and pay Western for the power they purchase.  Id. at ¶ 7.  In addition to paying for the water and power they receive, CVP Water Customers and CVP Power Customers also repay the Government for the "allocated proportional reimbursable costs of building, operating and maintaining the [Central Valley Project]."  Id.  Since the CVP is primarily a water-focused project, CVP Water Customers are responsible for more than three-quarters of the CVP repayment costs, and CVP Power Customers are responsible for less than one quarter of those costs.  Id.

In 1992, to offset the environmental impacts from the Central Valley Project, Congress passed the CVPIA.  As part of the CVPIA, Congress created a fund designated as the "Restoration Fund" to restore the fish and wildlife habitats within the Central Valley Project.  The Restoration Fund is one possible source of funding for CVPIA projects and activities.  Id. at ¶ 29.  CVPIA funding is also available through separate federal and state appropriations.  Id.  In order to raise additional money for the Restoration Fund project, the CVPIA requires CVP Water Customers and CVP Power Customers to contribute payments assessed by Reclamation.  Id. at ¶8.  The contributions from CVP Water Customers and CVP Power Customers include the additional annual mitigation and restoration payments ("M&R payments) that are at issue in this case.  Id. at ¶ 35.  Congress also contemplated

other, nondiscretionary sources of revenue streams to support the Restoration Fund: (1) the Friant Surcharge, established in section 3406(c)(1), requiring water contractors who receive water from the Friant Division of the CVP to be assessed a charge per acre foot of water delivered; (2) the contract pre-renewal charge listed in section 3404(c)(3) to encourage early renewal of long-term water contracts; (3) the water transfer charge, authorized by section 3405(a)(1)(B), directing a charge on certain water transferred between a CVP and non-CVP contractor; and (4) a tiered water charge, established in section 3405(d).  From the possible sources of revenue streams, Reclamation can collect up to $50 million for the Restoration Fund as appropriated by Congress each year.  The total collection amount is subject to statutory limitations.

    B.  <u>Relevant Facts of This Case</u>

As stated, the CVPIA authorizes the appropriation of up to $50 million for the Restoration Fund.  Reclamation has proposed appropriations language between fiscal years 2008 and 2017, which Congress has adopted with the exception of fiscal year 2013.  Stip. ¶ 27.  Each year, Reclamation has requested Restoration funding of $50 million, and Congress has directed the collection of the full amount of payments authorized by section 3407(d) of the CVPIA.  <u>See</u> JX 4; <u>see also</u> Lubas-Williams, Tr. 1299-1300.  In developing the Restoration Fund budget, Reclamation relies on a three-year rolling average calculated using one year of actual collections from the previous fiscal year and one year of projected calculations from the current fiscal year.  Lubas-Williams, Tr. 1233–35.  In practice, Reclamation attempts to collect as close as it can to the $50 million ceiling, because it believes the language in the appropriations acts and the CVPIA require this outcome. Mooney, Tr. 539–40.

Reclamation's practice prioritizes the attempt to reach $50 million over ensuring that CVP Water and Power Customers pay in proportion to their repayment allocations. Mooney, Tr. 579.  It attempts to justify this action by stating that collecting $50 million is a requirement based on appropriations language.  Mooney, Tr. 649–50; 660.  Therefore, if other funding sources do not sufficiently materialize to allow Reclamation to meet the $50 million ceiling, which has been the case in some years, Reclamation seeks to collect $30 million in M&R payments.  Mooney, Tr. 582–83.  In order to reach the $30 million, Reclamation calculates the difference between what it expects to receive from CVP Water Customers and $30 million. Mooney, Tr. 642–43.  It then assesses the difference to CVP Power Customers.  <u>Id.</u>

1.  <u>Reclamation's Assessment and Collection Process: Water Customers</u>

Most water contracts require contractors to schedule and pay water charges two months in advance, so Reclamation collects an estimated amount of water charges prior to actual payment.  Wolfe, Tr. 827, 947. Reclamation area office specialists categorize and track water deliveries.  Wolfe, Tr. 948–50.  Once delivery information is entered into Reclamation's system, the regional office performs an accounting analysis to confirm water rates and to ensure that Reclamation received payment for water and Restoration Fund charges.  Wolfe, Tr. 946–47, 952.  Reclamation describes its water accounting analysis as a three-step process.  First, Reclamation verifies water deliveries between area offices and contractors.  Wolfe, Tr. 951.  Following water delivery verification, Reclamation prepares for a rate "true-up," during which Reclamation compares estimated rates and actual cost information to determine each contractor's net position.  Wolfe, Tr. 947, 953–54. Lastly, Reclamation reviews charges and payments received to determine if there is an underpayment or overpayment. Wolfe, Tr. 954.  If there is an underpayment, the system generates a bill for the contractor, and the bill states that payment is due within thirty days.   <u>Id.</u>   Reclamation's practice concerning water contractors' potential overpayment is unclear. <u>See</u> Wolfe, Tr. 840.

2.  <u>Reclamation's Assessment and Collection Process: Power Customers</u>

To calculate CVP Power Customers' payment obligation, Reclamation starts with a $90 million ceiling, for the three years reflecting the prior, current and upcoming fiscal years, in order to maintain the three-year rolling average going forward.  Trujillo-Bixby, Tr. 91–94. Reclamation uses the actual amount collected for the prior year and projected payments for the current fiscal year; it then subtracts that sum from the $90 million to reach the CVP Power Customers' payment obligation.  Trujillo-Bixby, Tr. 91–92.  Prior to the start of each fiscal year, Reclamation sends Western a letter informing Western of CVP Power Customers' payment obligations for M&R charges.  <u>See</u> Rieger, Tr. 1751–52; <u>see also</u> Trujillo-Bixby, Tr. 85–86.  Partially through the fiscal year, Reclamation conducts a midyear adjustment, during which Reclamation may adjust the power payment obligation from the amount stated in the initial obligation letter to more accurately reflect the charges for the remainder of the fiscal year ("midyear adjustment").  Rieger, Tr. 1752.  The midyear adjustment is based on M&R collections and more current hydrologic projections.  Trujillo-Bixby, Tr. 100; Mooney, Tr. 370.  At the end of the fiscal year, Reclamation undergoes a "true-up" process, in which it compares actual M&R payment receipts to the projected payments for that year.  Trujillo-Bixby, Tr. 85, 106.

If the actual M&R payments received in a recently concluded fiscal year are lower than the projected amount of M&R payments for that year, this occurrence constitutes a

"shortfall." Trujillo-Bixby, Tr. 107.  In the event of a shortfall, Reclamation notifies CVP Power Customers and rolls the additional amount owed by power users into the three-year average; this action affects the second projected year in the three-year rolling average, allowing Reclamation to maintain the $30 million ceiling on a three-year average.  Trujillo-Bixby, Tr. 268.  If the actual M&R payments received in a given year exceed the projected M&R payment amount, Reclamation temporarily moves the excess amount to a suspense fund and issues a credit to the CVP Power Customers' payment for the following fiscal year.  Trujillo-Bixby, Tr. 110–12.

Reclamation's ability to collect from CVP Water Customers directly affects CVP Power Customers.  For example, drought years in California affect Reclamation's ability to collect M&R payments from CVP Water Customers, because less water is sold and delivered in dry years; Reclamation only collects M&R payments on water that is both sold and delivered.  Mooney, Tr. 641; Wolfe, Tr. 828.  When water deliveries are low, Reclamation's practice results in CVP Power Customers exceeding their proportion of the CVP Repayment Costs.

According to Plaintiffs, Reclamation's assessment of the Restoration Fund payments has caused CVP Power Customers to pay more than $120 million in excess charges.  Am. Compl. at ¶¶ 10–11.  Plaintiffs in this lawsuit seek reimbursement of the $120 million in Restoration Fund payments that they claim were assessed by Reclamation in violation of section 3407(d)'s proportionality provision.  The parties principally disagree about whether the proportionality provision in section 3407(d)(2)(A) is a limitation on the $50 million to be collected for the Restoration Fund, and whether Reclamation has attempted to achieve said proportionality.

## Procedural History

Plaintiffs filed their complaint in this Court on September 4, 2014.  On January 20, 2015, the Government filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.  The Court denied the Government's motion on June 29, 2015.  See N. California Power Agency v. United States, 122 Fed. Cl. 111 (2015).  Plaintiffs filed an amended complaint on September 27, 2016.  Dkt. No. 35.

The Court conducted a trial in this case during January 16 – 25, 2018, in San Francisco, California.  The trial was limited to the issue of the Government's liability and did not address valuation.  The Court heard testimony concerning Reclamation's CVPIA implementation, M&R payment collections, and accounting practices.  David Mooney, former CPVIA Program Administrator; David Murillo, Regional Director; Gail Trujillo-

Bixby, CVPIA Accountant; Autumn Wolfe, Regional Financial Manager and former CVP Ratesetting Manager; Ann Lubas-Williams, Program Coordination Office Manager; and Richard Woodley, Regional Resources Manager, served as witnesses from Reclamation's Mid-Pacific Region.   Regina Rieger, Rates Manager for Western's Sierra Nevada Customer Service Region, testified about Western's interpretation of the CVPIA and CVP Power Customers' payment burden.  The parties simultaneously filed post-trial briefs on April 2, 2018 and response briefs on May 4, 2018.  See Dkt. Nos. 102, 103, 104, 105.  The Court heard closing arguments at the National Courts Building in Washington, D.C. on June 1, 2018.

## Discussion

Under the Tucker Act, the Court can hear any claim that is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491.  It is well established that based on the Tucker Act, the Court can hear claims "made for recovery of monies that the government has required to be paid contrary to law."  Areolineas Argentinas v. United States, 77 F.3d 1564, 1572 (Fed. Cir. 1996) (defining an illegal exaction claim).  An illegal exaction claim may be maintained where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  Id. at 1572–73.  Overpayment claims are one of the quintessential illegal exaction claims.  See Suwannee S.S. Co. v. United States, 279 F.2d 874, 876–77 (Fed. Cir. 1960).  Jurisdiction to recover the exaction is provided when "the exaction is based on an asserted statutory power," Areolineas, 77 F.3d at 1573, and the statute invoked by the plaintiff must provide "either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted,'" Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (citing Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).  In order to prevail on an illegal exaction claim, Plaintiffs must demonstrate that the funds collected by Reclamation were taken contrary to the Central Valley Improvement Act.

A. Statutory Interpretation and Limitations to Reclamation's Collection Requirement

Plaintiffs first argue that Reclamation's methodology for calculating M&R charges violates the CVPIA's proportionality provision, because proportionality is a strict limitation to which Reclamation's total revenue collection must comply.  In order to evaluate this assertion, the Court has examined the relevant provisions of the statute.  See

<u>Sante Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 472 (1997) (explaining that the starting point in any case involving statutory construction is the language of the statute itself).

Section 3407(b), the meaning of which is not in dispute, authorizes "up to $50,000,000 per year (October 1992 price levels) . . . to be appropriated to the Secretary to be derived from the Restoration Fund to carry out programs, plans, and habitat restoration, improvement, and acquisition provisions of this title . . . ."

Section 3407(c) is titled "Mitigation and Restoration Payments by Water and Power Beneficiaries."  Subsection 3407(c)(1) states:

> To the extent required in appropriation Acts, the Secretary shall assess and collect additional annual mitigation and restoration payments, in addition to the charges provided for or collected under [other] sections . . . of this title, consisting of charges to direct beneficiaries of the Central Valley Project under subsection (d) of this section in order to recover a portion or all of the costs of fish, wildlife, and habitat restoration programs and projects under this title.

By its very language, subsection 3407(c)(1) directs the assessment and collection of M&R charges from the CVP's direct beneficiaries – CVP Water and Power Customers.  These M&R payments are to be collected in addition to other, nondiscretionary charges listed in the statute.

Subsection 3407(c)(2) first states:

> The payment described in this subsection shall be established at amounts that will result in the collection, during each fiscal year, of an amount that can be reasonably expected to equal the amount appropriated each year, subject to subsection (d) of this section, and in combination with all other receipts identified under this title, to carry out the purposes identified in subsection (b) of this section. . . .

This text describes one method for M&R fund collections: the appropriations approach. Under this approach, Reclamation would be required to achieve total collections equal to the appropriated amount.  The total collection would be "subject to subsection (d) of this section."  After introducing the appropriations approach, subsection 3407(c)(2) continues:

> Provided, That if the total amount appropriated under
> subsection (b) of this section for the fiscal years following
> enactment of this title does not equal $50,000,000 per year
> (October 1992 price levels) on an average annual basis, the
> Secretary shall impose such charges in fiscal year 1998 and in
> each fiscal year thereafter, subject to the limitations in
> subsection (d) of this section, as may be required to yield in
> fiscal year 1998 and in each fiscal year thereafter total
> collections equal to $50,000,000 per year (October 1992 price
> levels) on a three-year rolling average basis for each fiscal year
> that follows enactment of this title.

This excerpt explains another method for M&R fund collections: the $50 million approach. Under this approach, if the total amount appropriated by Congress for the fiscal years following the enactment of the CVPIA does not equal $50 million per year on an average annual basis, Reclamation is required to impose charges as may be sufficient to yield $50 million per year on a three-year rolling average basis. The total collections would be "*subject to the limitations* in subsection (d) of this section." (Emphasis added).

The parties do not dispute that subsection 3407(c)(2) identifies two funding methods: the appropriations approach and the $50 million approach. See Pls.' Br. at 42; see also Def.'s Resp. at 13–14. The parties do, however, disagree about which method governs this case and what limitations are included in subsection (d).

Reading 3407(c)(2) on its face, if the $50 million appropriations amount was not realized after the enactment of the CVPIA, the $50 million approach evidently governs. The total amount that Congress appropriated for the years following CVPIA enactment has not equaled $50 million per year on an average annual basis. Mooney, Tr. 625. Therefore, the $50 million method, not the appropriations approach, applies here. Plaintiffs argue that the appropriations approach should be used, emphasizing that it is superior to the $50 million approach and yields better results in both wet and dry years. See Tr. of Closing Arg. at 1887, Dkt. No. 107. Unfortunately, the applicable approach does not depend on which method produces more favorable results. As written, the statute requires the latter-explained funding method if the $50 million amount was not fulfilled. As this amount was not realized, the $50 million approach governs. The statute, however, contains limitations on this approach.

Subsection 3407(d)(2)(A), the remaining disputed provision in this litigation, reads:

> The Secretary shall require Central Valley Project water and
> power contractors to make such additional annual payments as

are necessary to yield, together with all other receipts, the amount required under paragraph (c)(2) of this subsection; *Provided*, That such additional payments shall not exceed $30,000,000 (October 1992 price levels) on a three-year rolling average basis; *Provided further*, That such additional annual payments shall be allocated so as not to exceed $6.00 per acre-foot (October 1992 price levels) for agricultural water sold and delivered by the Central Valley Project, and $12.00 per acre-foot (October 1992 price levels) for municipal and industrial water sold and delivered by the Central Valley Project; *Provided further*, that the charge imposed on agricultural water shall be reduced, if necessary, to an amount within the probable ability of the water users to pay as determined and adjusted by the Secretary no less than every five years, taking into account the benefits resulting from implementation of this title; *Provided further*, That the Secretary shall impose an additional annual charge of $25.00 per acre-foot (October 1992 price levels) for Central Valley Project water sold or transferred to any State or local agency or other entity which has not previously been a Central Valley Project customer and which contracts with the Secretary or any other individual or district receiving Central Valley Project water to purchase or otherwise transfer any such water for its own use for municipal and industrial purposes, to be deposited in the Restoration Fund; *And Provided furthe*r, That upon the completion of the fish, wildlife, and habitat mitigation and restoration actions mandated under section 3406 of this title, the Secretary shall reduce the sums described in paragraph (c)(2) of this section to $35,000,000 per year (October 1992 price levels) and shall reduce the annual mitigation and restoration payment ceiling established under this subsection to $15,000,000 (October 1992 price levels) on a three-year rolling average basis. The amount of the mitigation and restoration payment made by Central Valley Project water and power users, taking into account all funds collected under this title, shall, *to the greatest degree practicable*, *be assessed in the same proportion*, measured over a ten-year rolling average, as water and power users' respective allocations for repayment of the Central Valley Project.

(Emphases added).  In assessing the language of the statute, the first phrase after the word "Provided" imposes a $30 million annual limit on the total amount of M&R payments. Applying this limitation to the three-year rolling average, Reclamation cannot collect more than $90 million in M&R payments over a three-year period.  The next phrase, beginning with "Provided further," places a ceiling on charges to agricultural and municipal and industrial ("M&I") water sold and delivered by the CVP.  The third phrase, also starting with "Provided further," continues this list and explains that Reclamation must reduce the additional M&R payments imposed on agricultural water by considering their ability to pay for such charges.  The next provision, also beginning with "Provided further," places an additional charge of $25 per acre-foot for certain M&I water.  The list ends with the final clause prefaced by "And Provided further," and indicates that if Reclamation completes the fish, wildlife, and habitat mitigation and restoration actions mandated under section 3406, the $50 million mandate and the M&R ceiling are reduced.  Semicolons, suggesting a continuation of some sort, separate the aforementioned phrases.  The parties agree that these five phrases are subsection (d) limitations, meaning, these limitations supersede Reclamation's requirement to collect $50 million.[3]  See Pls.' Br. at 44; Def.'s Br. at 43.  Plaintiffs argue that the list of limitations also includes the final sentence of this subsection:

> The amount of the mitigation and restoration payment made by Central Valley Project water and power users, taking into account all funds collected under this title, shall, to the greatest degree practicable, be assessed in the same proportion, measured over a ten-year rolling average, as water and power users' respective allocations for repayment of the Central Valley Project.

3407(d)(2)(A).    According to Plaintiffs, Reclamation is required to prioritize proportionality over the $50 million collection, similar to the other provisions.  Pls.' Br. at 44.  Plaintiffs maintain that in order for the proportionality provision to constitute one of

---

[3] In its June 29, 2015 ruling, the Court referred to five limitations to which Reclamation is subject when collecting M&R funds.  It included (1) the $30 million ceiling mandate, (2) maximum for agricultural and M&I water, (3) the consideration of agricultural water customers' ability to pay; (4) reduction of the annual ceiling upon carrying out section 3406 actions, and (5) the proportionality provision.  The Court omitted the additional annual charge of $25 per acre-foot for certain M&I water, which neither party questions as a subsection (d) limitation.  The Court instead mentioned proportionality as the fifth limitation.  See N. California Power Agency, 122 Fed Cl. at 114.  Though mistakenly absent from that opinion, the $25 per acre-foot charge is a clear qualification.  The effect of the proportionality provision is discussed below in this Opinion.

the subsection (d) limitations, it must simply qualify as a restraint and be listed within 3407(d) of the CVPIA.  Id. at 50.

In opposition, the Government argues that proportionality is not a subsection (d) limitation, as it is distinct from the five provisos that precede it.  Def.'s Br. at 43.  The Government explains, "A proviso is '[a]n article or clause in any statute, contract, grant, or other writing, by which a condition is introduced, usually beginning with the word provided.'"  Id. at 42 (citing Webster's New International Dictionary (2d ed. 1995)).  "The general office of a proviso is to except something from the enacting clause, or to qualify it or restrain its generality."  Republic of Iraq v. Beaty, 556 U.S 848, 858 (2009) (quoting United States v. Morrow, 266 U.S. 531, 534 (1925)).  A proviso limits the language of the legislature.  See Tilge v. United States, 2 U.S. Cust. App. 129, 134 (1911).  The Government contends that all of the subsection (d) limitations, to which the $50 million ceiling is subject, are prefaced with provisos such as "Provided," "Provided further," and "And Provided further," making the exceptions easily identifiable.  Def.'s Br. at 43.

The Court agrees with the Government.  There is a clear distinction between the five limiting clauses and the proportionality provision that immediately follows.  If Congress intended for the proportionality provision to function in the same limiting way as the other five phrases, it would have used similar language.  Instead, the proportionality provision is not prefaced by such language and is likely not of the same ilk as the undisputed limitations.  Plaintiffs reject this interpretation, noting that Congress intentionally placed the proportionality provision in subsection (d) along with the five, definite limitations.  Pls.' Br. at 51–52.  This point, however, begs the question of Congress' intent to visibly exclude limiting language from the proportionality provision in addition to using disparate punctuation for the proportionality sentence.  This exclusion is more telling than the proportionality placement.  "[W]here, in a statute, an express limitation or proviso is made with respect to a given subject matter, and, in the same statute, no such limitation or proviso is made applicable to a related subject matter, *the absence of the limitation or proviso in the second instance is a strong indication that it is not intended to apply*, or by implication, that it is excluded.")  Green Co. v. Chelsea, 149 F.2d 927, 929 (1st Cir. 1945) (emphasis added).

Distinguishing between the limiting clauses in 3407(d) and the proportionality provision in that section is aligned with Reclamation's actual practice.  According to the record and trial testimony, Reclamation's assessment of M&R charges to CVP Water and Power Customers is premised on the statutory mandate to collect $50 million per year on a three-year rolling average basis.  Mooney, Tr. 582–83.  In doing so, Reclamation seeks to collect the maximum amount as the five limitations allow. The Court concludes that the proportionality provision is not a strict subsection (d) limitation to be prioritized above the

$50 million collection target.   Therefore, Reclamation's practice of considering proportionality after the collection target does not violate the CVPIA.

### B. Practicability and Reclamation's Attempts to Achieve Proportionality

Although the Court does not interpret the proportionality provision to be an absolute limitation that supersedes Reclamation's $50 million collection target, it is nonetheless a statutory provision that Reclamation cannot ignore.   The use of the word, "shall" in the provision is mandatory language.   See, e.g. Sharp Elecs. Corp. v. McHugh, 707 F.3d 1367, 1373 (Fed. Cir. 2013).   The proportionality provision gives some flexibility to Reclamation in assessing the payment allocations for water and power users by stating that proportionality shall be carried out "to the greatest degree practicable."   The statute itself anticipates that proportionality may not always be possible.   The relevant issues, therefore, are whether proportionality has been practicable for Reclamation, and if so, whether Reclamation has attempted to achieve proportionality.

#### 1. Feasibility

The word "practicable" means "possible" or "feasible."   According to Reclamation, proportionality has not been practicable due to the imperative to collect $50 million, the relevant limitations on the $50 million total, and depressed water revenues.   Mooney, Tr. 643.   Annual appropriations language directs Reclamation "to assess and collect the full amount of the annual mitigation and restoration payments authorized by section 3407(d)."   See JX 4.   The total amount collected is affected by the sum of non-M&R, or nondiscretionary charges, namely the Friant Surcharge, the contract pre-renewal charge, the water transfer, and the tiered water charge. For example, if the non-M&R charges equal $30 million per year, Reclamation could collect $20 million in M&R charges per year in order to reach the $50 million total.   If the nondiscretionary charges equal $10 million per year, Reclamation would collect $30 million in M&R charges per year, keeping in line with the statute's $30 million ceiling and attempting to reach the $50 million collection total.   The total M&R payments do not exist in a vacuum.   They are affected by the non-M&R charges as well as statutory limitations.

Generally, the non-M&R revenues have not been at least $20 million a year and are affected by external factors such as droughts in California.   Mooney, Tr. 641, 655–56. Therefore, in an attempt to fulfill the $50 million mandate, Reclamation has collected the maximum amount of M&R charges.   Def.'s Br. at 46.   It is possible that, when drafting the CVPIA, Congress anticipated greater revenue from non-M&R sources.   However, this has not been the reality.   See Wolfe, Tr. 703–04, 798, 924–25, 928–29.   Based on this fact,

Reclamation's practice of collecting the maximum amount of M&R charges in order to achieve $50 million is logical.

With this consideration, the Court examines if proportionality is possible when Reclamation collects the maximum M&R payments allowed. Subsection 3407(d) limitations are integral to this analysis. 3407(d)(2)(A) limits M&R payments on agricultural and M&I water sold and delivered by the CVP and mandates necessary reductions for certain water contractors' ability to pay. The strict limitations on water charges conversely affect the amount of charges assessed to power contractors. Achieving proportionality while collecting the maximum amount of M&R charges is therefore a difficult objective and may not be feasible in many years, depending on the circumstances.

### 2. Proportionality Attempts

Reclamation's practices show its consideration of proportionality when possible. For example, although Reclamation has the discretion to collect less than $6 per acre-foot for agricultural water and $12 per acre-foot for M&I water, it does not. It instead assesses the maximum additional M&R water charges. Trujillo-Bixby, Tr 177–79; Mooney, Tr. 345, 583, 636. This maximization increases the amount paid by water contractors, thereby decreasing power contractors' obligation. See Money, Tr. 637. Similarly, Reclamation is working toward completing the objectives set forth in section 3406, because completion of these activities reduces the restoration fund ceiling—decreasing CVP Power Customers' payments. See Mooney, Tr. 583, 667–68.

Also, in fiscal year 2014, Reclamation contemplated an effort titled, "Pathway to Proportionality," intending to examine ways to bring CVP Power Customers' Restoration Fund payments closer to proportionate with their CVP cost allocation. Mooney, Tr. 657. While Reclamation did not execute the plan due to its lack of viability, the consideration should not go unnoticed. Mooney, Tr. 657–58. Lastly, Reclamation has made attempts to consider proportionality through its actions in fiscal years 2014 and 2015 concerning the mid-year adjustment. During these years, California experienced a severe drought, resulting in lower water payments. Mooney, Tr. 641–42. In order to provide CVP Power Customers relief, Reclamation rescinded the fiscal year 2014 midyear adjustment. Murillo, Tr. 1073–75. In fiscal year 2015, Reclamation decided to defer the midyear adjustment to alleviate the burden on power users, keeping the power payment obligation as listed in that year's initial obligation letter. These actions were within Reclamation's discretion and were attempts to lessen CVP Power Customers' payment obligation.

At trial, the evidence showed that Reclamation's collection and monitoring methods for water charges perhaps work better in theory than in practice. Some CVP Water Customers have unpaid balances, dating back several years. Wolfe, Tr. 897, 900–01.

Reclamation has conducted historical reconciliations to address monitoring issues and water payment discrepancies. During such reconciliations, which consisted of Reclamation comparing charges reflected in the system and actual payments and billing for unpaid charges, Reclamation discovered a $1.1 million discrepancy in Restoration funds. Wolfe, Tr. 995. Similarly, historical reconciliations revealed a $624,000 discrepancy in M&R charges. Wolfe, Tr. 987. Plaintiffs view Reclamation's imperfect collection methods as evidence of the agency's violation of the statute. Reclamation's monitoring and enforcement methods are not perfect and arguably should be improved. Nonetheless, these collection practices do not amount to an illegal exaction.

The CVPIA provides protections for water customers that it does not make available to power customers. As such, proportionality becomes a difficult objective when considering the effect that drought years have on water payments, coupled with the collection limitations mandated by the statute. Considering the totality of the circumstances, Plaintiffs have not shown that Reclamation's assessment and collection practices violate the CVPIA.

<u>Conclusion</u>

For the reasons stated above, the Court finds that Reclamation's practices do not violate the CVPIA. Plaintiffs' amended complaint is DISMISSED. The clerk is directed to enter judgment accordingly. No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge

15